UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | 18 CV 01210 |
| Plaintiff, | 18 Civ. _____ |
| v. | **COMPLAINT** |
| LINDSAY RAE MCINTYRE, | |
| Defendant. | |



FILED
FEB 12 2018
USDC WP SDNY

International Business Machines Corporation ("IBM" or the "Company"), by its undersigned attorneys, upon personal knowledge with respect to itself and its actions and otherwise on information and belief, alleges as follows:

### Nature of the Action

1.      Defendant Lindsay Rae McIntyre was, until she abruptly resigned to compete against IBM, one of IBM's most senior executives with knowledge of IBM's most closely guarded and competitively sensitive strategic plans and recruitment initiatives. As IBM's Chief Diversity Officer, McIntyre was responsible for, among other things, devising and executing IBM's confidential strategies to recruit, retain, and promote diverse talent. McIntyre therefore generated and had in depth knowledge of highly confidential and competitively sensitive information about IBM's diversity strategies, initiatives, hiring targets, representation data, and technologies and innovations. Specifically, among other things, McIntyre knows confidential data about diverse representation in every segment of IBM's workforce; she personally oversaw the teams responsible for developing Artificial Intelligence-based tools and methodologies designed to track career development, recommend growth opportunities and potential paths for promotion, and monitor diversity metrics at the Company; and she led a

confidential IBM initiative to identify, target, and devise plans to recruit more than 50 top diverse external candidates for specific executive positions at the Company. All of these responsibilities required McIntyre to generate and have in depth knowledge of IBM's highly confidential, proprietary, and competitively sensitive information regarding the Company's diversity data, strategies and initiatives. McIntyre now threatens to violate her one-year noncompetition agreement by accepting the identical position of Chief Diversity Officer at Microsoft Corporation ("Microsoft"), one of IBM's main competitors, and taking her knowledge of IBM confidential information and trade secrets with her.

2.    As Microsoft has admitted, disclosure of the very type of confidential information that McIntyre possesses—non-public diversity data, strategies and initiatives—can cause real and immediate competitive harm. Faced with public condemnation and class action litigation for being rated the worst technology company for the employment, pay and promotion of women, Microsoft has represented in court that its own diversity data, strategies and initiatives are so secret—and would cause so much harm if they fell into the hands of its competitors—that there is a "compelling need" to keep such information under seal. In the pending gender discrimination class action against it, Microsoft has persuaded the court to seal, and thus conceal from its competitors, the very same type of confidential data and information that IBM seeks to protect in this action. Microsoft argued to the court that if such information were to be publicly disclosed, "Microsoft's competitors could unjustly gain access to Microsoft's business strategies and initiatives related to diversity at Microsoft's expense and may use the information in recruiting efforts against the company."[1] Microsoft further argued that diversity in the

---

[1] *See* Microsoft's Response to Plaintiffs' Motion to Seal at 5, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash Apr. 12, 2017) (Dkt. No. 177) (hereinafter "Microsoft April 2017 Brief") (*see* Declaration of Pietro J. Signoracci dated February 11, 2018 ("Signoracci Declaration") Exhibit 3).

technology industry is an "imperative"; that "Microsoft actively seeks to foster greater diversity in its work force, and to recruit top diverse talent in a highly competitive labor market" because "[o]therwise, Microsoft would risk lack of key market representation; impact to innovation; [and] lack of diverse talents pipeline"; and that Microsoft "invests tens of millions of dollars in developing and implementing diversity initiatives, which constitute "confidential business information which, if disclosed, could cause competitive harm."

3.      Faced with the threat that, by competing *against* IBM in the same executive job for Microsoft, McIntyre will use and disclose -- whether intentionally or not -- the same kind of "confidential and sensitive information" that "would place [IBM] at a competitive disadvantage if made public," IBM brings this action to enjoin McIntyre to honor her agreements with IBM and to recover damages for McIntyre's breaches of those agreements.

4.      This is precisely the situation McIntyre promised to avoid in order to safeguard IBM's protectable business interests. If not enjoined to wait before competing against IBM—as she expressly agreed she would—McIntyre will take with her to Microsoft all the highly confidential information she knows about IBM's current diversity representation data, its strategic hiring and promotion plans, and its diversity recruitment initiatives.

5.      All of this IBM confidential information, by Microsoft's own admissions, would be very valuable to Microsoft in its attempts to compete against IBM. For that reason, IBM has taken steps to keep its confidential information regarding its diversity representation data, strategic hiring and promotion plans, and diversity recruitment initiatives closely held as secret. This information is not shared outside the Company, and its distribution within IBM is limited to the very few employees who need access to the information for business purposes.

3

6.     Given McIntyre's first-hand knowledge of IBM's confidential strategies, secret diversity representation data, proprietary technologies, and recruitment, retention, and promotion plans for diverse talent, it is inevitable that McIntyre will use IBM's confidential information and trade secrets against IBM if she joins Microsoft before the expiration of her non-compete period. McIntyre will be leading the team at Microsoft responsible for deciding how to compete against IBM for diverse talent in the marketplace, and how to attempt to win business from customers based on the purported strength and potential success of Microsoft's diversity initiatives. Switching sides in the competition with the type of competitively sensitive information McIntyre knows puts those secrets at high risk of disclosure—which is exactly why McIntyre agreed to wait a reasonable interval before joining a competitor.

7.     Nevertheless, McIntyre intends to join Microsoft and lead its efforts to compete against IBM for the very same diverse talent she was responsible for recruiting, retaining, and developing at IBM. And she intends to do so immediately, without waiting the twelve months required by her noncompetition agreement.

8.     McIntyre's breach is especially serious, and unnecessary, considering that she could find high level executive employment at any number of companies that do not compete directly against IBM in the very business for which McIntyre was responsible. With her skills and experience as an executive in the Human Resources department of a Fortune 100 company, and as IBM's Chief Diversity Officer for the past two and a half years, McIntyre is marketable for high ranking executive positions at companies that do not compete directly against IBM. But she has chosen to leave IBM and go not only to a direct competitor, but one of the competitors that would have the greatest use for the IBM confidential information, trade secrets, and proprietary technologies and initiatives she was entrusted to protect.

9. Accordingly, the injunctive relief IBM seeks by this action—enforcing McIntyre's noncompetition agreement for the twelve-month period to which she agreed—is just, reasonable and necessary. IBM also seeks to recover the equity compensation McIntyre has forfeited by violating her contractual duties to IBM.

## Parties

10. IBM is a New York corporation with its principal place of business in Armonk, New York.

11. Lindsay Rae McIntyre is a citizen of Canada who resides in Ridgefield, Connecticut.

## Jurisdiction and Venue

12. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest.

13. The Court has personal jurisdiction over McIntyre because, in the Noncompetition Agreement, she agreed to exclusive jurisdiction and venue in the federal and state courts of the State of New York, New York County or County of Westchester, for all disputes arising from the agreement.

14. Venue properly lies in this Court both because of McIntyre's aforementioned agreement, and pursuant to 28 U.S.C. § 1391, because IBM's headquarters are in this judicial district and a substantial part of the events giving rise to the claims occurred in this district.

## Relevant Facts

**IBM**

15.     IBM is a globally integrated business that offers information technology ("IT") products and services to a wide range of business, public sector, and individual customers.

16.     IBM designs, develops, and brings to market a portfolio of hardware, software, and service offerings for customers in all industries, including (1) Hybrid Cloud, which offers businesses and government entities infrastructure, services, and tools for integrated Cloud Computing; (2) Cognitive Solutions, which provides Artificial Intelligence-based software and services to clients; (3) Global Business Services, which offers professional management and strategic consulting services as well as systems integration, and application management services to help clients use and integrate technology into their businesses; (4) Enterprise Server and Storage Systems, which offers clients a wide-range of data storage products, data protection services, and IT infrastructure hardware such as servers; and (5) IBM Blockchain, which offers clients a suite of cloud-based services to help clients create and manage blockchain networks.

17.     IBM also competes against other companies in the IT industry for the top talent in the marketplace, and especially for the top diverse talent at executive levels. IBM's efforts to recruit, retain, and develop its "pipeline" of diverse talent are key to IBM's corporate strategy.

18.     IBM relies on trade secrets, other confidential information, and proprietary methods and processes in developing, implementing and marketing its business strategies, and each year it makes substantial investments and dedicates extensive research efforts to its confidential recruitment, retention, and development strategies. Among other things, IBM utilizes trade secrets, proprietary information and methods, confidential technical know-how, competitively sensitive information and confidential competitive strategies to devise, develop,

6

implement, and execute its strategic hiring and promotion plans and its diversity recruitment and development initiatives.

## IBM-Microsoft Competition in Products, Services and, Critically, Diversity

19.    IBM and Microsoft compete for the same business and government customers. They market computer hardware, software and services offerings that compete directly against each other in many areas of information technology ("IT"), including Cloud Computing, Artificial Intelligence, Global Business Services, Enterprise Server and Storage Systems, and IBM Blockchain. For example, recent industry reports identify IBM and Microsoft as among the top competitors in Cloud Computing,[2] Data Science Platforms,[3] Access

---

[2]    *See, e.g.*, Gartner, *Magic Quadrant for Cloud Infrastructure as a Service, Worldwide* (June 15, 2017), https://www.gartner.com/doc/reprints?id=1-2G2O5FC&ct=150519; *see also* Forbes, *IBM Joins Microsoft, Amazon Atop Cloud World; Booming Cloud Business Ends Long Revenue Decline* (Jan. 19, 2018), https://www.forbes.com/sites/bobevans1/2018/01/19/ibm-joins-microsoft-amazon-atop-cloud-world-booming-cloud-business-ends-long-revenue-decline/#24e2a4a49c49; Investor's Business Daily, *Amazon Cloud Services Under Growing Threat From Microsoft, Google, IBM* (Apr. 28, 2017), http://www.investors.com/news/technology/amazon-cloud-services-under-growing-threat-from-microsoft-google-ibm (identifying IBM and Microsoft as among the top competitors in Cloud Computing and stating that "IBM continues to lead in hosted private cloud" based on report from Synergy Research Group).

[3]    *See, e.g.*, Gartner, *Magic Quadrant for Data Science Platforms* (Feb. 14, 2017), https://www.gartner.com/doc/reprints?id=1-3TKD8OH&ct=170215&st=sb (listing IBM as a "leader" and Microsoft as a "visionary" in the market for data science platforms).

Management,[4] Streaming Analytics,[5] Operational Database Management Systems,[6] the

Blockchain Industry,[7] and Enterprise File Sync and Share Platforms.[8]

       20.    Microsoft is listed in IBM's financial disclosures as among IBM's top

"broad based competitors" in IBM's global services business and among IBM's "principal

competitors" in the highly competitive enterprise management software market.[9] Likewise, IBM

is listed in Microsoft's financial disclosures as a competitor in enterprise-wide computing

systems; server applications; database, business intelligence, and data warehousing solutions;

system management solutions; products for software developers; and Azure, Microsoft's cloud

computing offering.[10]

---

[4] *See, e.g.*, Gartner, *Magic Quadrant for Access Management, Worldwide* (June 7, 2017),
https://www.gartner.com/doc/reprints?id=1-42VJ7MJ&ct=170612&st=sb (listing IBM and Microsoft as
"leaders" in the access management market).

[5] *See, e.g.*, Forrester, *Streaming Analytics Q3 2017* (Sept. 19, 2017),
https://reprints.forrester.com/#/assets/2/308/'RES136545'/reports (including IBM and Microsoft in a list of 13
evaluated vendors in the streaming analytics sector).

[6] *See, e.g.*, Gartner, *Magic Quadrant for Operational Database Management Systems* (Sept. 19, 2017),
https://www.gartner.com/doc/reprints?id=1-3JD7HF0&ct=161005&st=sb (listing Microsoft and IBM as
"leaders" in the operational database management systems market).

[7] *See, e.g.*, CNBC Tech, *IBM Far Outranks Microsoft as Blockchain Industry Leader, Research Says* (Nov. 2,
2017), https://www.cnbc.com/2017/09/18/ibm-far-outranks-microsoft-as-blockchain-industry-leader-
report.html ("[IBM] is better positioned than competitor Microsoft as far as its blockchain credentials are
concerned. More than 40 percent of tech executives and leaders in the blockchain sector ranked IBM as top,
with only 20 percent saying the same of Microsoft.").

[8] *See, e.g.*, Forrester, *The Forrester Wave: Enterprise File Sync and Share Platforms—Hybrid Solutions Q4 2017*
(Dec. 12, 2017), https://reprints.forrester.com/#/assets/2/961/RES138372/reports (including Microsoft and IBM
in a list of 11 vendors in this sector).

[9] International Business Machines Corp., Annual Report (Form 10-K) (Feb. 23, 2016), at pp. 10–11,
www.sec.gov/Archives/edgar/data/51143/000104746916010329/a2226548z10-k.htm.

[10] Microsoft Corp., Annual Report (Form 10-K) (July 28, 2016), at pp. 7–8,
https://www.sec.gov/Archives/edgar/data/789019/000119312516662209/d187868d10k.htm.

21.     IBM and Microsoft also compete head-to-head in the fierce competition to recruit and retain the top talent in the IT industry,[11] especially diverse talent (*i.e.*, candidates who bring to the workplace a diversity of thought, experience, and background, including race, ethnicity, gender, sexual orientation, or disability status, among others). For example, recent press articles discuss IBM's trend-setting diversity recruitment initiatives, and Microsoft's attempts to catch up to IBM in the competition for diverse talent.[12] In response to increasing pressure to improve its performance on diversity and equality issues, Microsoft has announced and implemented various diversity and inclusion initiatives and has promised to allocate more than $55 million per year to develop innovative diversity and equality programs.[13]

22.     For both IBM and Microsoft, having a diverse workforce is not just ethically sound, and not just a mere recruiting strategy. IBM has long demonstrated that a diverse workforce is critical to the quality, innovation and competitive strength of its products and services, particularly against Microsoft.[14] Diversity is a competitive necessity, not only

---

[11]   *Id.* at p. 24 ("The market for highly skilled workers and leaders in our industry is extremely competitive.").

[12]   *See, e.g.*, Black Enterprise, *Intel and IBM Set the Diversity Example for Technology and for Us All* (Mar. 18, 2016), http://www.blackenterprise.com/intel-and-ibm-set-the-diversity-example-for-technology-and-for-us-all/ (explaining that "IBM was concerned with diversity in technology long before it became a much-discussed topic" and "other companies include Apple, Google, and Microsoft, which are also launching diversity initiatives and programs, especially ones that support young people of color in pursuing STEM careers"). The article also notes that "former IBM salesman and now Microsoft chairman John Thompson spoke recently about the support he received from IBM when he faced racism from clients as a salesman on the road." *Id.*

[13]   *See* Microsoft's Opposition to Plaintiffs' Motion for Class Certification at 1, 10–12, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash Jan. 5, 2018) (Dkt. No. 285) (Signoracci Decl. Ex. 15).

[14]   *See, e.g.*, IBM, *For More Diversity in AI, a Look to the Next Generation* (Sept. 18, 2017), https://www.ibm.com/blogs/insights-on-business/ibmix/diversity-ai-look-next-generation/ (explaining IBM's view that a gender-imbalanced workforce limits the applications of the AI it develops because "AI reflects the human biases of its creators"); GeekWire, *IBM in the Cloud: Inside the Tech Giant's Quest to Stand Out Against Amazon, Microsoft, and Google* (Mar. 23, 2017), https://www.geekwire.com/2017/ibm-cloud-inside-tech-giants-quest-compete-amazon-microsoft-google/ (IBM "has a different view than others" on its AI approach"); Fortune, *Microsoft CEO Satya Nadella Has Much to Say About Artificial Intelligence* (Sept. 27, 2016), http://fortune.com/2016/09/26/microsoft-satya-nadella-artificial-intelligence/ ("'We are not pursuing A.I.

because it is important to customers and business partners, but also because it drives and enhances product innovation and quality. IBM measures its products, services, and diversity hiring initiatives against those offered by Microsoft, and reports publicly on instances when customers choose IBM over Microsoft.[15]

23. For its part, Microsoft has publicly acknowledged that successful diversity and inclusion efforts are essential to its competitive success, stating that "diversity [and] inclusion is a business imperative for Microsoft" and "a diverse workforce brings a blend of perspectives and experiences that spark greater innovation, customer satisfaction, employee productivity, and corporate profitability."[16] Microsoft also concedes, as is relevant here, that diversity hiring is extremely competitive and high-stakes: "Microsoft actively seeks to foster greater diversity in its workforce, and to recruit top diverse talent in a highly competitive labor market. Otherwise, Microsoft could risk lack of key market representation; impact to innovation; lack of diverse talent pipeline, [and] high attrition and onboarding cost."[17]

24. Academic studies and industry commentary confirm that when companies succeed in competition for diverse talent, they are more likely to succeed in their competition for customers' business.[18] McIntyre herself is well aware of the importance of diversity initiatives

---

to beat humans at games,' said Nadella, taking a subtle hit at competitors like Google and IBM . . . . Microsoft's overarching goal is to 'democratize A.I.'").

[15] *See, e.g.*, IBM News Releases, *Workday taps IBM Cloud for development and testing* (Aug. 17, 2016), https://www.ibm.com/blogs/cloud-computing/2016/08/workday-softlayer-development-testing/ (promoting article noting that Workday, a company specializing in Human Resources software, selected IBM over Microsoft as its cloud services partner for a multi-year deal).

[16] Microsoft April 2017 Brief, *supra* note 1, at 5.

[17] *Id.*

[18] *See, e.g.*, Vivian Hunt, Dennis Layton & Sara Prince, McKinsey & Company, *Diversity Matters* (2015) (diversity study examining the relationship between the level of diversity and company financial performance using proprietary data sets for 366 public companies across a range of industries, including technology, in

and strategies in gaining a competitive edge in the IT industry. In an internal IBM presentation

she prepared regarding the "critical business imperative" of building and maintaining a diverse

workforce "to maximize IBM's profit margin," McIntyre wrote: "[T]he more diverse the

population, the greater the innovative solutions, *the wider the lead*."

### McIntyre's Responsibilities as Chief Diversity Officer at IBM

25.     Throughout her 20-year career at IBM, McIntyre held various executive

positions. In 2010, McIntyre was promoted to the position of Vice President in Human

Resources. In 2015, she became Chief Diversity Officer and Vice President, Leadership

Succession Planning.

---

Canada, Latin America, the United Kingdom, and the United States, and finding that "[c]ompanies in the top quartile for racial and ethnic diversity are 35 percent more likely to have financial returns above their respective national industry medians"; that "[c]ompanies in the top quartile for gender diversity are 15 percent more likely to have financial returns above their respective national industry medians"; and that "more diverse companies . . . are better able to win top talent and improve their customer orientation, employee satisfaction, and decision making, leading to a virtuous cycle of increasing returns"); *see also* Julia Dawson, Richard Kersely & Stefano Natella, Credit Suisse Research Institute, *The CS Gender 3000: Women in Senior Management* (2014) (diversity study identifying and mapping more than 28,000 senior managers at over 3,000 companies and finding that companies with higher female representation at the board level or in top management exhibit higher returns on equity, higher valuations and also higher payout ratios); *see also* Sheen S. Levine et. al., *Ethnic Diversity Deflates Price Bubbles*, 111 PNAS 52 (Dec. 30, 2014) (a diversity and homogeneity study finding that price bubbles in markets often arise not only from individual errors or financial conditions, but also from the social context of decision making, suggesting that diversity leads to more scrutiny and challenging of decisions and ideas, less overconfidence and better outcomes for businesses).

Microsoft's CEO, Satya Nadella, has also emphasized the value of diversity in competing for business. *See* Exhibit A to Declaration of Anne B. Shaver in Support of Plaintiffs' Motion to Certify Class at 6-7, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash. Oct. 27, 2017) (Dkt. No. 233-1) (Signoracci Decl. Ex. 10) (letter from Satya Nadella to all Microsoft Employees). In his letter, Nadella states:

> [W]e need to recruit more diverse talent to Microsoft at all levels of the company. As you saw in the numbers we recently released, we have work to do at Microsoft . . . . These numbers are not good enough, especially in a world in which our customers are diverse and global. To achieve this goal—especially in engineering—we will have to expand the diversity of our workforce at the senior ranks and re-double our efforts in college and other hiring.

26.     On Sunday, January 14, 2018, McIntyre announced her resignation from IBM and informed IBM that she intended to accept an offer to join Microsoft as its Chief Diversity Officer, without waiting the twelve months required by her noncompetition agreement with the Company (the "Noncompetition Agreement," attached hereto as **Exhibit A**).  In response, IBM raised with McIntyre its concerns regarding the Noncompetition Agreement and her confidentiality and non-solicitation obligations.  McIntyre and Microsoft nevertheless informed IBM on January 18, 2018, that Microsoft intended for McIntyre's employment to commence on January 30, 2018.  As a result of discussion among counsel, Microsoft and McIntyre subsequently agreed to postpone McIntyre's start date to February 13, 2018.

27.     As IBM's Chief Diversity Officer, McIntyre was responsible for, among other things:

a)      Monitoring and delivering presentations regarding confidential data about diverse representation in every segment of IBM's workforce;

b)      Overseeing a confidential initiative to identify, target, and devise plans to recruit more than 50 top diverse external candidates for executive positions at the Company.

c)      Devising and implementing IBM's competitive and proprietary strategies to recruit and retain diverse talent and to develop IBM's existing talent pipeline for potential promotion within the Company;

d)      Influencing the design and overseeing the development and implementation of proprietary (and non-public) software IBM uses internally to identify, track, and place the Company's most qualified diverse candidates into executive level positions.  This proprietary methodology, which IBM designed and uses exclusively in-

12

house, deploys Artificial Intelligence and algorithms to help IBM extract the most value from its diverse talent pipeline, which in turn improves the Company's performance across all of its business segments; and

e)     Overseeing the development of IBM's proprietary methodologies for monitoring diversity metrics in its business units and incentivizing business managers to meet their diversity goals. These accountability measurement methodologies were designed and used exclusively in-house, are unique to IBM, and have significantly contributed to IBM's competitiveness in the IT industry.

28.     In her role as the Vice President of IBM's Leadership Succession Planning, McIntyre became further involved in tracking, developing, and placing all candidates for executive positions in the Company. McIntyre oversaw confidential projects to develop Artificial Intelligence-based tools that the Company designed in-house and used internally for these purposes. As IBM's Chief Diversity Officer, McIntyre had a particular focus on diverse executive candidates and placements. Accordingly, McIntyre knows confidential information about IBM's executive succession planning technologies and strategies, including the identities, statuses, and prospects of IBM's top diverse talent.

29.     McIntyre was also a frequent speaker on behalf of IBM at industry conventions and other gatherings. Through this role, McIntyre marketed IBM and its business across all of its product lines. McIntyre developed close relationships with many important IBM customers and partners in her role as IBM's Chief Diversity Officer.

30.     The materials McIntyre prepared and reviewed in the course of performing her duties as Chief Diversity Officer confirm that she was intimately knowledgeable about the Company's most sensitive diversity information, including discussions about IBM's strengths

13

and competitive strategies against its major competitors, specifically with respect to data about diverse representation in every segment of IBM's workforce and detailed information about the targeting, recruitment, and retention of diverse talent. McIntyre was also personally involved in identifying specific diverse candidates for IBM's corporate management and in planning the succession and promotion of IBM executives generally.

31.     This highly confidential information will remain relevant and competitively sensitive throughout 2018 and into 2019. McIntyre regularly participated in meetings to discuss products and initiatives under development—often under her direct supervision—including information regarding diversity initiatives that IBM has not yet launched or publicly announced that will enable IBM to better compete to recruit, retain, and develop diverse talent. For example, McIntyre personally oversaw the teams responsible for developing a Cognitive-based tool (*i.e.,* Artificial Intelligence) designed to track career development and recommend growth opportunities and potential paths for promotion. McIntyre knows the proprietary technological components of this tool; she knows confidential information about where IBM is in the process of developing and internally deploying the tool; and she would be able to lead a team at a competitor to build a similar product to improve that company's diversity initiatives, placement processes, and overall performance—and, potentially, to market the tool commercially.

32.     IBM has gone to great lengths to safeguard as secret the confidential information that McIntyre possesses. For example, on several occasions IBM has successfully opposed Freedom Of Information Act ("FOIA") requests for the disclosure of this information on the basis of confidentiality, secrecy, and competitive harm. In 2012, a FOIA request was made for IBM's Equal Employment Opportunity Employer Information Reports ("EEO-1

reports") for the period covering 2004–2010. IBM opposed the FOIA request, arguing that its

EEO-1 reports contained confidential, commercially sensitive information covered by Exemption

4 of FOIA, 5 U.S.C. Section 552(b)(4), which protects ". . . trade secrets and commercial or

financial information obtained from a person [that is] privileged or confidential." IBM explained

in a letter to the Office of Federal Contract Compliance Program ("OFCCP") that disclosure of

the requested information would cause substantial harm to the Company's competitive position.

After making an independent decision based on Exemption 4, the OFCCP agreed with IBM's

position, denied the FOIA request, and stated:

> We believe that [IBM] made mandatory submissions to the government of
> information described as confidential proprietary trade secret information not
> released or otherwise made available to the public, or to competitors. OFCCP
> believes that [IBM] provided well defined and reasoned objections to the release
> of its submitted information based upon business practices and experience.
> OFCCP has determined it will withhold [IBM's] EEO-1 Reports based upon
> FOIA Exemption 4 criteria.

(Attached as **Exhibit E** is the OFCCP's Decision Rejecting CNN's FOIA Request dated

Dec. 6, 2012.) Subsequent FOIA requests for IBM's EEO-1 reports were made in 2013,

2015, 2016, and 2017, and each request resulted in the same outcome—the OFCCP's

rejection of the FOIA request and refusal to disclose IBM's confidential information.

(Attached as **Exhibits F to I** are OFCCP Decisions Rejecting FOIA Requests from 2013,

2015, 2016, and 2017.) As IBM's Chief Diversity Officer, McIntyre has first-hand

knowledge of the confidential information contained in these reports that IBM has

safeguarded as closely held secrets.

**Microsoft Defends a Gender Discrimination Class Action, in Which**
**It Zealously Guards Its Diversity Data, Initiatives and Strategies**

33.     In recent years, Microsoft has come under scrutiny for its lack of diversity

and its allegedly discriminatory employment practices. In 2014, Microsoft's CEO, Satya

Nadella, appeared at the annual Grace Hopper Celebration of Women in Computing. When asked to offer advice to women who are not comfortable asking for a pay raise, Nadella responded: "It's not really about asking for the raise, but knowing and having faith that the system will actually give you the right raises as you go along." Nadella added: "And that, I think might be one of the additional superpowers that quite frankly women who don't ask for a raise have. Because that's good karma."[19] Nadella's comments were met with outrage online and negative press reports about Microsoft's allegedly discriminatory employment practices.[20] Nadella subsequently attempted to walk back his views in an email to employees, claiming that "the overall difference in base pay among genders and races (when we consider level and job title) is consistently within 0.5% at Microsoft." This only stimulated further criticism, as Microsoft employees responded that Nadella's presentation did not address the company's alleged failure to promote women to higher level positions, even when those women were doing the same jobs as their male employees who had more senior titles and higher salaries.[21]

34.    Nadella's statements in 2014 jump-started a conversation about the lack of diversity and equality at Microsoft. Microsoft also received public criticism for its lack of progress after the company chose to release some of its diversity statistics in 2015.[22] One

---

[19]    *See* Plaintiff's Motion for Class Certification at 13–14, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash Oct. 27, 2017) (Dkt. No. 232) (Signoracci Decl. Ex. 9); *see also* Forbes, *'Karma' Hasn't Fixed These Three Facts About the Gender Pay Gap* (Oct. 10, 2014), https://www.forbes.com/sites/ruchikatulshyan/2014/10/10/karma-hasnt-fixed-these-three-facts-about-the-gender-pay-gap/#61c303a3c08d.

[20]    CBS News, *Microsoft CEO blasted over remarks on women's pay* (Oct. 10, 2014) https://www.cbsnews.com/news/microsoft-ceo-satya-nadella-blasted-over-remarks-on-womens-pay/.

[21]    *See* Plaintiff's Motion for Class Certification, *supra* note 19, at 13–14.

[22]    *See* Marco della Cava, *Microsoft 2015 Diversity Numbers Flat, Women Fall*, USA Today (Nov. 23, 2015), https://www.usatoday.com/story/tech/2015/11/23/microsoft-2015-diversity-numbers-flat-women-fall/76273440/ (noting that female employment at Microsoft fell from 29% in 2014 to 26.8% in 2015); Wired, *Microsoft*

publication rated Microsoft as the worst tech giant in both female employment percentage and promoting women into leadership roles.[23] Then, in September 2015, a group of Microsoft employees filed a class action complaint against Microsoft, *Moussouris* v. *Microsoft Corporation*, alleging that Microsoft engaged in a pattern of discrimination against female technical employees in performance evaluations, compensation, and promotions.[24]

35.     In public, Microsoft employees accused the company of promoting a "Boy's Club" atmosphere, and even employees in Microsoft's Human Resources department "acknowledge[d] that Microsoft's [diversity and inclusion] initiatives are little more than window dressing . . . ."[25]

36.     In April 2017, in connection with discovery in the *Moussouris* class action, plaintiffs sought to file on the public docket certain internal communications and documents regarding Microsoft's diversity data, strategies and initiatives, which Microsoft had produced in discovery under a confidentiality designation. In response, Microsoft took the position that the information was not merely confidential, but so sensitive and potentially damaging to Microsoft if revealed to its competitors (*e.g.*, IBM), that the court should take the extraordinary measure of putting the information under seal.

---

*Releases More Diversity Stats, and They Aren't Pretty* (Jan. 5, 2015), https://www.wired.com/2015/01/microsoft-diversity/ ("The new statistics released by Microsoft are disappointing at best. . . . Comparing Microsoft's numbers from last year to this year, the new report also shows that Microsoft is indeed working to close diversity gaps. But it's doing so at a snail's pace.").

[23]   The Verge, *How Do Tech's Biggest Companies Compare on Diversity* (Aug. 20, 2015), https://www.theverge.com/2015/8/20/9179853/tech-diversity-scorecard-apple-google-microsoft-facebook-intel-twitter-amazon.

[24]   Second Amended Compl. ¶ 1, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash. Apr. 6, 2016) (Dkt. No. 55) (Signoracci Decl. Ex. 2).

[25]   *See* Plaintiff's Motion for Class Certification, *supra* note 19, at 19–20, 27.

37.     Microsoft asserted that the diversity exhibits contained "confidential business information which, if disclosed, could cause competitive harm to Microsoft."[26] Microsoft explained that this information is "closely-held," "available to a very small audience within Microsoft," and guarded by "strict internal confidentiality procedures."[27] Microsoft argued that this material should either remain sealed or be produced with redactions because, if disclosed, "Microsoft's competitors could unjustly gain access to Microsoft's business strategies and initiatives related to diversity at Microsoft's expense and may use the information in recruiting efforts against the company."[28] Microsoft argued—and the *Moussouris* Court agreed—that there was "good cause" to seal these exhibits because of "the prospective competitive harm" that would flow from dissemination of certain information regarding Microsoft's diversity data, strategies, and initiatives.[29]

38.     In July 2017, in connection with its efforts to keep under seal internal communications about a 2016 Equal Pay Study Microsoft published, Microsoft again argued to

---

[26]  *See* Microsoft April 2017 Brief, *supra* note 1, at 2, 4–6.

[27]  *Id.* Microsoft repeated these arguments in subsequent briefing in the Moussouris Class Action, describing "confidential and sensitive information regarding Microsoft's public relations and communications strategies, along with information regarding internal business operations and internal discussion regarding the company's competitors, all of which would place Microsoft at a disadvantage if made public." *See* Microsoft's Response to Plaintiffs' Motion to Seal at 2, 4–6, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash. July 26, 2017) (Dkt. No. 220) (Signoracci Decl. Ex. 7); *see also* Declaration of Dev Stahlkopf in Support of Microsoft's Response to Plaintiffs' Motion to Seal at ¶¶ 3–4, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash. July 26, 2017) (Dkt. No. 222) ("Stahlkopf July 26, 2017 Declaration") (Signoracci Decl. Ex. 8); *see also* Microsoft's Response to Plaintiffs' Motion to Seal at 2–4, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash. July 12, 2017) (Dkt. No. 209) (Signoracci Decl. Ex. 5); Declaration of Dev Stahlkopf in Support of Microsoft's Response to Plaintiffs' Motion to Seal at ¶¶ 3–4, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash, July 12, 2017) (Dkt. No. 211) (Signoracci Decl. Ex. 6).

[28]  *See* Microsoft April 2017 Brief, *supra* note 1, at 5.

[29]  *Id.* at 1, 4.

the *Moussouris* court that its diversity and inclusion data and strategy are "non-public, highly sensitive, confidential, and private."[30] Microsoft explained that it "maintains strict internal confidentiality policies so as to limit distribution of communications like those references in [the Exhibit]."[31]

39. In December 2017, in connection with plaintiffs' motion for class certification in the *Moussouris* action, Microsoft filed additional briefing arguing that, beyond "good cause," there are "compelling reasons" to keep its confidential information regarding diversity data, strategies, and initiatives under seal.[32] Microsoft argued that the court should seal confidential information "reflecting the company's efforts to consider new perspectives and identify actionable pathways forward for positively impacting the complex challenge of gender inclusion and diversity in the technical field," as such information "gives Microsoft an advantage over competitors."[33] Microsoft made clear the risk that competitors would use this information, if published, to their benefit and to Microsoft's detriment: "Unsealing these materials would give competitors direct, accurate information as to Microsoft's diversity and inclusion strategies, and the results of those strategies (both what is working and what is not), which competitors could use in developing their own strategies."[34] Microsoft explained that "this is an especially

---

[30] Stahlkopf July 26, 2017 Decl., *supra* note 27, at ¶¶ 3–4.

[31] *Id.*

[32] *See* Microsoft's Sur-reply to Plaintiffs' Motion to Seal at 4–5, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash. Dec. 15, 2017) (Dkt. No. 280) (Signoracci Decl. Ex. 13).

[33] *Id.*

[34] *Id.*

acute concern" in the context of "the highly competitive tech industry where the same companies are competing for the same talent, the minority of which is female."[35]

40. In January 2018, Microsoft made another motion to seal documents it intended to rely on in opposing class certification. Microsoft argued that the court should seal documents containing "confidential information reflecting Microsoft's philosophy, strategies, and techniques for evaluating employee performance and approaching compensation and promotion," because such "documents describe processes developed by and for Microsoft management to further its ability to meet strategic objectives and advance its competitive interests, both from a business perspective and to attract and retain employees."[36] Microsoft also argued, again, that the "[c]onfidential diversity and inclusion strategies that Microsoft uses to its competitive advantage" should remain under seal.[37] Microsoft emphasized that its diversity and inclusion data and strategy are "non-public, highly sensitive, confidential, and private, both internally and externally."[38] Microsoft also explained that "[i]n furtherance of its efforts to maintain the confidentiality of diversity information, Microsoft expends considerable efforts to ensure that such information is not publicly disclosed."[39]

---

[35] *Id.*

[36] *See* Microsoft's Motion to Seal Documents Submitted in Support of Its Opposition to Plaintiffs' Motion for Class Certification at 4, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash. Jan. 5, 2018) (Dkt. No. 283) (Signoracci Decl. Ex. 14).

[37] *Id.*

[38] Declaration of Shinder Dhillon in Support of Microsoft's Opposition to Plaintiffs' Motion for Class Certification at ¶ 19-20, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash. Jan. 5, 2018) (Dkt. No. 296) (Signoracci Decl. Ex. 16).

[39] *Id.*

41.     The sealing order from the court in *Moussouris* is itself under seal but, as reflected on the docket, the district court has granted multiple motions by Microsoft to keep its confidential documents under seal and to have certain filings appear on the public docket only in redacted versions.[40]

**McIntyre's Noncompetition Agreement with IBM**

42.     Precisely because of her exposure to highly confidential and commercially sensitive information regarding IBM's diversity data, strategies and initiatives, McIntyre was one of IBM's senior executives who the Company asked to sign a noncompetition agreement, to restrict the potential disclosure of confidential IBM information in the event that she left the Company.

43.     McIntyre executed her Noncompetition Agreement with IBM on January 25, 2012.

44.     In that agreement, McIntyre acknowledged and agreed that:

during [her] employment with IBM and for twelve (12) months following the termination of [her] employment . . . , [she] will not directly or indirectly within the "Restricted Area" (i) "Engage in or Associate with" (a) any "Business Enterprise" or (b) any competitor of the Company; or (ii) . . . solicit, for competitive business purposes, any customer of the Company with which [she was] directly or indirectly involved as part of [her] job responsibilities during the last twelve (12) months of [her] employment with IBM. (Noncompetition Agreement § 1(c)(i), 1(c)(ii).)

45.     The Noncompetition Agreement provides the following definitions for the defined terms in the foregoing provision:

---

[40]  *See Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash. July 27, 2018) (Dkt. No. 223) (granting motions to seal documents).

(a)     "Restricted Area" is defined as "any geographic area in the world in which [she] worked or for which [she] had job responsibilities during the last twelve (12) months of [her] employment with IBM." (*Id.* § 2(d).)

(b)     "Engage in or Associate with" is defined to mean, among other things, acting as an "associate, employee, member, consultant, or contractor." (*Id.* § 2(c).)

(c)     "Business Enterprise" is defined as "any entity that engages in, or owns or controls an interest in any entity that engages in, competition with any business unit or division of the Company in which [she] worked at any time during the three (3) year period prior to the termination of [her] employment." (*Id.* § 2(a).)

46.     The Noncompetition Agreement also defines "IBM confidential information" as including, among other things, "the Company's methods, information, systems, plans for acquisition or disposition of products, expansion plans, financial status and plans, customer lists, client data, personnel information and trade secrets of the Company," as well as "the Company's unique selling, manufacturing and servicing methods and business techniques, training, service, and business manuals, promotional materials, training courses and other training and instructional materials, vendor and product information, customer and prospective customer lists, other customer and prospective customer information and other business information." (*Id.* § 1(a), § 1(b).)

47.     Additionally, in the Noncompetition Agreement, McIntyre agreed and acknowledged that:

(a)     "the business in which IBM and its affiliates are engaged is intensely competitive" (*Id.* § 1(a));

22

(b)     her "employment by IBM has required . . . that [she] have access to, and knowledge of, confidential information of the Company" (*Id.*);

(c)     "the Company would suffer irreparable harm if [she failed] to comply with [the noncompetition and the nonsolicitation covenants]" (*Id.* § 3); and

(d)     "the restrictions set forth in [the noncompetition and the nonsolicitation covenants] are reasonable as to geography, duration and scope." (*Id.*)

48.     In sum, McIntyre agreed in the Noncompetition Agreement that, for a period of one year following the termination of her employment from IBM, she would not work for any competitor of IBM in any geographic area in the world for which she had job responsibilities in the last twelve months of her employment with IBM, and she would not directly or indirectly solicit, for competitive business purposes, any customer of the Company with which she was directly or indirectly involved in the last year of her employment with IBM. McIntyre made this promise to protect IBM's confidential information and to prevent a situation where her employment by a competitor would result in the intentional or unintentional use or disclosure of IBM confidential information to which she was exposed in her IBM employment. McIntyre's proposed employment at Microsoft as Chief Diversity Officer violates this obligation: Microsoft directly competes with the business unit at IBM in which McIntyre worked prior to the termination of her employment.

## McIntyre Violates the Noncompetition Agreement by Accepting Employment with Microsoft As Its Chief Diversity Officer

49.     Notwithstanding the promises she made in her Noncompetition Agreement, McIntyre told IBM on Sunday, January 14, 2018 that she intended to leave her job as *IBM*'s Chief Diversity Officer and accept a job as *Microsoft*'s Chief Diversity Officer, without waiting the twelve-month period she agreed would be reasonable. IBM subsequently learned

23

that McIntyre intended to commence employment with Microsoft immediately, on January 30, 2018.[41]

50.     McIntyre's announcement of her resignation and immediate plans to compete directly against IBM was a surprise to the Company. Just two days before she told IBM of her plans, IBM had internally announced on its intranet, on January 12, 2018, that effective February 1, 2018 McIntyre would receive a promotion with increased pay, an expanded role, and appointment to IBM's selective Growth & Transformation Team, a leadership group of about 300 high-level executives from all areas of IBM tasked with solving critical challenges and focusing on transforming the Company and its strategies.

51.     What IBM knows now, however, is that while she was negotiating her promotion at IBM and working with the Company's Communications team to prepare the internal announcement of her future at IBM, McIntyre was meeting with Microsoft's top executives and negotiating a competitive offer from Microsoft. In fact, McIntyre visited Microsoft's offices on January 10, 2018, after IBM had informed her of her promotion. And on January 12, 2018, the same day that IBM internally announced McIntyre's promotion, McIntyre accepted Microsoft's offer to become its Chief Diversity Officer—and to take with her to Microsoft all of her knowledge of IBM's diversity data, strategies and initiatives.

52.     Just as they were vital to her role as IBM's Chief Diversity Officer, the confidential information and IBM diversity data, strategies and technologies McIntyre knows, and the IBM customers, partners, and potential diversity recruits McIntyre knows by virtue of her responsibilities as IBM's Chief Diversity Officer, will all be relevant in performing her responsibilities in the proposed role as Microsoft's Chief Diversity Officer, reporting directly to

---

[41]    The parties negotiated for McIntyre not to commence employment at Microsoft until February 13, 2018.

Kathleen Hogan, Microsoft's Chief People Officer and Executive Vice President of Human Resources.

53.     Indeed, the job that McIntyre intends to take at Microsoft is identical to and in direct competition against the job she held at IBM. McIntyre intends to move from the leadership of IBM's diversity strategy, recruitment and retention team to the leadership of Microsoft's diversity strategy, recruitment and retention team. Her proposed role at Microsoft would involve her in the development and implementation of Microsoft's competitive strategies to compete against IBM, including with respect to recruiting and retaining diverse talent in the IT industry and using those diversity initiatives to compete against IBM for customers.

54.     Microsoft itself admitted in its briefing in *Moussouris* that a competitor with knowledge of the valuable confidential information of exactly the type that McIntyre possesses—diversity data, strategies, methodologies and initiatives—would use that information to the company's detriment. *See* Microsoft's April 2017 Brief, *supra* note 1, at 6 ("The materials sought to be kept under seal have little value *other than to Microsoft's competitors*, who stand to gain from publication of this information at Microsoft's expense." (emphasis added)).

55.     McIntyre's defection to Microsoft poses a particular competitive threat to IBM, not only because she knows the Company's trade secrets, but also because she developed relationships with significant IBM customers and partners on the strength of IBM's goodwill, products and services, and served as the public face of IBM at major industry events as IBM's highest ranking customer goodwill representative.

56.     McIntyre's breach of her Noncompetition Agreement is especially serious, and unnecessary, considering that she could find high level executive employment at any number of companies that do not compete directly against IBM in the very business for which McIntyre

25

was responsible. With her skills and experience as an executive in the Human Resources department of a Fortune 100 company, and as IBM's Chief Diversity Officer for the past two and a half years, McIntyre is marketable for high ranking executive positions at companies that do not compete directly against IBM. Today, every sizable business, financial institution, insurance company, law firm, consulting firm, and non-profit organization is in need of a diversity officer. While Microsoft's diversity needs may be acute, they are not unique. Indeed, McIntyre informed IBM that she had considered, but rejected, an opportunity at a company in the food services industry.

### IBM's Right to Rescind Long-Term Incentive Awards It Provided to McIntyre

57.     As recently as June 2017, McIntyre accepted awards of IBM stock options, Restricted Stock Units, and Performance Share Stock Units under IBM's 1999 Long-Term Performance Plan, as amended through August 1, 2007 ("LTPP"). (The LTPP Prospectus is attached hereto as **Exhibit B**.) McIntyre's equity awards also were governed by a document titled "Terms and Conditions of Your Performance Share Units (PSUs) – Growth Award: Effective August 1, 2016" (the "Terms and Conditions") (attached hereto as **Exhibit C**).

58.     The equity awards that McIntyre received under the LTPP were in addition to, and not part of, the salary she received for her work at IBM.

59.     Under the LTPP, equity awards are subject to cancellation and rescission in certain circumstances, and any exercise, payment or delivery pursuant to a rescinded award is subject to repayment. In particular, the awards may be canceled and rescinded if the participant engages in "Detrimental Activity," as defined in the Plan.

60.     Detrimental Activity consists of eight categories of conduct, including, among others:

   (a)  the rendering of services for any organization or engaging directly
      or indirectly in any business which is or becomes competitive with
      the Company; and

   (b)  any other conduct or act determined to be injurious, detrimental or
      prejudicial to any interest of the Company.

  61.  McIntyre's plan to work for Microsoft constitutes Detrimental Activity

under the LTPP, triggering IBM's right to rescind and recover awards granted to her in the prior

twelve months.

  62.  McIntyre had the choice each year whether to accept her equity awards.

Upon acceptance of the awards in June 2017, she agreed that she understood that "IBM may

cancel, modify, rescind, suspend, withhold or otherwise limit or restrict this Award in

accordance with the terms of the Plan, including, without limitation, canceling or rescinding this

Award if you render services for a competitor prior to, or during the Rescission Period. You

understand that the Rescission Period that has been established is 12 months." (A copy of

McIntyre's "Long-Term Incentive Award Acceptance Information" is attached hereto as **Exhibit**

**D.**)

  63.  In the Terms and Conditions to the LTPP, McIntyre acknowledged and

agreed that if she were to violate the prohibition on direct or indirect solicitation of IBM

customers, "the Company would suffer irreparable harm" and that "the Company will be entitled

to any appropriate relief including money damages, equitable relief and attorneys' fees." (Ex. C

p. 5.)

  64.  The Terms and Conditions also require McIntyre to pay "all costs and

expenses incurred by the Company" in a successful action to enforce the terms of the LTPP,

"including reasonable attorneys' fees." (*Id.* p. 4.)

65. The stock options that McIntyre exercised and Restricted Stock Units and Performance Share Stock Units that were released to her in the twelve months prior to her resignation and announcement of her intent to join Microsoft total approximately $101,311.75.

## COUNT I — Breach of Noncompetition Agreement

66. IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 65 above.

67. The Noncompetition Agreement is an enforceable agreement that imposes upon McIntyre contractual obligations.

68. IBM has complied with all material terms of that agreement.

69. McIntyre has breached the terms of that agreement by, among other things, accepting a position as Chief Diversity Officer of Microsoft without waiting for expiration of the one-year non-compete period to which she expressly agreed.

70. As McIntyre agreed in the Noncompetition Agreement, if she is not enjoined from working at Microsoft as Chief Diversity Officer until January 29, 2019, and thereby violating her Noncompetition Agreement, IBM will be irreparably injured.

71. In view of the similarity of McIntyre's proposed job at Microsoft to her job at IBM, she will inevitably (if inadvertently) make use of and/or disclose IBM trade secrets and other confidential and proprietary IBM information in performing her proposed role at Microsoft.

72. IBM will also be harmed if McIntyre violates the nonsolicitation covenants in the Noncompetition Agreement.

73. In these circumstances, IBM is entitled to an injunction to prevent such irreparable injury. IBM is also entitled to recover money damages to the extent that McIntyre is not enjoined from violating her agreement.

## COUNT II — Misappropriation of Trade Secrets

74.     IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 73 above.

75.     IBM possesses certain trade secrets and confidential information with which McIntyre is familiar, and which McIntyre has a common law duty not to disclose outside of IBM.

76.     The Noncompetition Agreement is an enforceable agreement that imposes upon McIntyre contractual obligations, including the obligations of nondisclosure with respect to IBM's confidential information.

77.     If she is permitted to work for Microsoft, McIntyre will inevitably (if inadvertently) use and/or disclose IBM trade secrets for her own benefit and for the benefit of Microsoft.

78.     As an unavoidable result of McIntyre's impending misappropriation of IBM trade secrets in violation of her common law and contractual duties, IBM will be damaged.

## COUNT III — Declaratory Judgment: Rescission of Equity Award

79.     IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 78 above.

80.     By accepting employment at Microsoft in competition against IBM, McIntyre has engaged in "Detrimental Activity" under the LTPP agreement, triggering IBM's right to rescind and demand repayment of equity awards granted to her in the prior twelve months.

81.     The LTPP agreement is an enforceable agreement, and IBM has performed all of its material obligations under the agreement.

82.     IBM has informed McIntyre of this claim.  McIntyre has refused and, on information and belief, will continue to refuse to return and repay her equity awards, as required by the LTPP agreement.

83.     IBM does not have an adequate, alternative remedy in another form of action.

84.     Accordingly, IBM is entitled to a declaratory judgment confirming its right to rescind and demand repayment of McIntyre's equity awards.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff IBM demands judgment seeking relief against defendant Lindsay Rae McIntyre as follows:

A.     Imposing a preliminary and permanent injunction ordering McIntyre to refrain from:  (i) breaching the terms of her Noncompetition Agreement with IBM; (ii) commencing employment with Microsoft as Chief Diversity Officer, or in any other position that would create a risk of inevitable disclosure of IBM trade secrets, prior to the expiration of her twelve-month noncompetition period on January 29, 2019; (iii) directly or indirectly soliciting, for competitive business purposes, any IBM customer with which McIntyre was directly or indirectly involved as part of her job responsibilities during the last twelve months of her employment with IBM prior to January 29, 2019; or (iv) directly or indirectly hire, solicit or make an offer to any employee of the Company to be employed or perform services outside of the Company prior to January 29, 2020.

B.     Declaring that IBM is entitled to rescind and demand repayment of the equity awards granted to McIntyre in the twelve months prior to her accepting employment with Microsoft;

C.    Awarding IBM its attorneys' fees, costs, and disbursements incurred as a result of this action;

D.    Awarding IBM monetary damages in an amount sufficient to compensate the Company for McIntyre's breaches of contract, together with rescission of any LTPP Awards McIntyre has received from IBM within the last twelve months and of any other compensation or benefits that IBM is entitled to rescind; and

E.    Awarding IBM such further relief as the Court deems just and proper.


Dated: New York, New York
       February 11, 2018


PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____
     Robert A. Atkins
     Liza M. Velazquez
     Pietro J. Signoracci

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
ratkins@paulweiss.com
lvelazquez@paulweiss.com
psignoracci@paulweiss.com

*Attorneys for Plaintiff*
*International Business Machines Corporation*