UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

    Plaintiff,

    v.

LINDSAY RAE MCINTYRE,

    Defendant.

---

18 Civ. _____

# 18 CV 01210



## PLAINTIFF IBM'S MEMORANDUM OF LAW IN SUPPORT
## OF ITS APPLICATION FOR A TEMPORARY RESTRAINING ORDER
## AND A PRELIMINARY INJUNCTION

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Robert A. Atkins
Liza M. Velazquez
Pietro J. Signoracci
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Attorneys for Plaintiff*
*International Business Machines Corporation*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT .......................................................................... 1

STATEMENT OF FACTS ................................................................................... 5

ARGUMENT ...................................................................................................... 23

    I.      IBM WILL SUFFER IRREPARABLE INJURY ABSENT INJUNCTIVE RELIEF ......................................................................................................24

           A.     The Risk of Disclosure of Trade Secrets Constitutes Irreparable Harm ..........................................................................................24

           B.     This Court Has Found Irreparable Harm Before Under IBM's Noncompetition Agreements ............................................................35

           C.     The Risk of Exploiting Customer Goodwill Constitutes Irreparable Harm ..........................................................................................37

           D.     McIntyre Stipulated That a Violation of Her Noncompetition Agreement Would Irreparably Harm IBM ...................................38

    II.     IBM IS LIKELY TO PREVAIL ON THE MERITS ...........................................39

           A.     IBM Has a Legitimate Interest in Safeguarding Its Confidential Information ................................................................................40

           B.     The Limitations on McIntyre's Post-IBM Employment Are Reasonable ........................................................................................42

    III.    IN THE ALTERNATIVE, SUFFICIENTLY SERIOUS QUESTIONS GO TO THE MERITS AND THE BALANCE OF THE EQUITIES WEIGHS IN IBM'S FAVOR ...................................................................................44

    IV.    A TEMPORARY RESTRAINING ORDER SHOULD BE ISSUED AND AN EXPEDITED SCHEDULE FOR THE MOTION SHOULD BE SET ..........45

CONCLUSION ................................................................................................... 46

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alside Div. of Associated Materials Inc.* v. *Leclair,*
    743 N.Y.S.2d 898 (N.Y. App. Div. 3d Dep't 2002) ................................................42

*Ayco Co., L.P.* v. *Feldman,*
    No. 1:10-CV-1213, 2010 WL 4286154 (N.D.N.Y. Oct. 22, 2010) ......................39

*Battenkill Veterinary Equine P.C.* v. *Cangelosi,*
    768 N.Y.S.2d 504 (N.Y. App. Div. 3d Dep't 2003) ................................................42

*BDO Seidman* v. *Hirshberg,*
    93 N.Y.2d 382 (N.Y. 1999) ..........................................................................38, 40

*Bus. Intelligence Servs., Inc.* v. *Hudson,*
    580 F. Supp. 1068 (S.D.N.Y. 1984).......................................................................44

*Cont'l Grp., Inc.* v. *Kinsley,*
    422 F. Supp. 838 (D. Conn. 1976).........................................................................25

*DoubleClick, Inc.* v. *Henderson,*
    No. 116914/97, 1997 WL 731413 (N.Y. Sup. Ct. Nov. 7, 1997) .........................41

*Estee Lauder Cos. Inc.* v. *Batra,*
    430 F. Supp. 2d 158 (S.D.N.Y. 2006)........................................................... passim

*Global Switching Inc.* v. *Kasper,*
    No. CV 06 412(CPS), 2006 WL 1800001 (E.D.N.Y. Jun. 28, 2006)....................37

*In re High-Tech Employee Antitrust Litig.,*
    No. 11-cv-02509, 2013 WL 163779 (N.D. Cal. Jan. 15, 2013)......................28, 42

*IBM Corp.* v. *Papermaster,*
    No. 08-CV-9078 (KMK), 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008)...... passim

*IBM* v. *Visentin,*
    No. 11 Civ. 399 (LAP), 2011 WL 672025 (S.D.N.Y. Feb. 16, 2011)....................36

*IDG USA, LLC* v. *Schupp,*
    No. 10-CV-76S, 2010 WL 3260046 (W.D.N.Y. Aug. 18, 2010) ..........................39

*Ikon Office Solutions, Inc.* v. *Usherwood Office Tech., Inc.,*
    No. 9202–08, 2008 WL 5206291 (N.Y. Sup. Ct. Dec. 12, 2008)..........................39

*Johnson Controls, Inc.* v. *A.P.T. Critical Sys., Inc.,*
    323 F. Supp. 2d 525 (S.D.N.Y. 2004)....................................................................37

**Page(s)**

*Lumex, Inc.* v. *Highsmith*,
  919 F. Supp. 624 (E.D.N.Y. 1996) ............................................................33, 34, 41

*Moussouris* v. *Microsoft Corporation*,
  No. 2:15-cv-01483 (W.D. Wash Jan. 5, 2018) ............................................ passim

*N. Atl. Instruments, Inc.* v. *Haber*,
  188 F.3d 38 (2d Cir. 1999) ...........................................................................38, 41

*Natsource LLC* v. *Paribello*,
  151 F. Supp. 2d 465 (S.D.N.Y. 2001) .................................................................44

*Softel, Inc.* v. *Dragon Med. & Scientific Commc'ns, Inc.*,
  118 F.3d 955 (2d Cir. 1997) ...............................................................................40

*Ticor Title Ins. Co.* v. *Cohen*,
  173 F.3d 63, 69 (2d Cir. 1999) ....................................................................38, 39

*Wal-Mart Stores, Inc.* v. *Mullany*,
  No. 6040-VCL, 2010 WL 9036778 (Del. Ch. Dec. 15, 2010) .............................34

**STATUTES**

Fed. R. Civ. P. 65(b) .........................................................................................45

Plaintiff International Business Machines Corporation ("IBM" or the "Company") respectfully submits this memorandum of law in support of its application for a temporary restraining order and a preliminary injunction to prevent its former senior executive, defendant Lindsay Rae McIntyre, from commencing employment at IBM's direct competitor, Microsoft Corporation ("Microsoft"), in violation of her one-year Noncompetition Agreement with IBM (the "Noncompetition Agreement").

## PRELIMINARY STATEMENT

On Sunday, January 14, 2018, Defendant Lindsay Rae McIntyre, IBM's Chief Diversity Officer since 2015, announced without warning that she planned to switch sides in the competition between IBM and Microsoft by becoming Microsoft's Chief Diversity Officer—and to do so immediately without waiting the twelve months required by her Noncompetition Agreement. McIntyre's announcement was unexpected: just two days before McIntyre told IBM she planned to join one of its top competitors in the identical role of Chief Diversity Officer, IBM had announced internally that McIntyre was set to receive a promotion with increased pay, and an expanded role, effective February 1.

By taking the identical job at Microsoft, and bringing the highly confidential and competitively sensitive information she knows about IBM's diversity data, strategies, and innovations, McIntyre threatens to disclose and use IBM's valuable business secrets for the benefit of one of IBM's most significant competitors. That would be a breach of her Noncompetition Agreement, and entitles IBM to a temporary restraining order and preliminary injunction to prevent the irreparable harm posed by McIntyre's imminent defection to Microsoft.

The grounds for injunctive relief have been admitted by Microsoft itself. Faced with public condemnation and class action litigation for being rated the worst technology company for the employment, pay, and promotion of women, Microsoft has represented in court

that its own diversity data, strategies, and initiatives are so secret—and would cause so much harm if they fell into the hands of its competitors—that there is a "compelling need" to keep such information under seal.  In the pending gender discrimination class action against it, Microsoft has persuaded the court to seal, and thus conceal from its competitors, the very same type of confidential data and strategies that IBM seeks to protect in this action.  The reasons Microsoft gave there are the same reasons IBM is entitled to injunctive relief here:

- Microsoft competes directly against IBM in the labor market for diverse talent.  Diversity in the technology industry is a "business imperative," Microsoft told the court, and Microsoft—like IBM—uses "confidential diversity and inclusion strategies" "to its competitive advantage."

- Microsoft—like IBM—"invests tens of millions of dollars in developing and implementing diversity initiatives."

- Microsoft—like IBM—considers much of its diversity data and many of its diversity strategies to be "non-public, highly sensitive, confidential, and private."  And also like IBM, "to maintain the confidentiality of [its] diversity information, Microsoft expends considerable efforts to ensure that such information is not publicly disclosed."

- Microsoft—like IBM—protects not just its diversity representation data, but also its confidential diversity recruitment and retention strategies and initiatives.  Microsoft urged the court to seal this information because, otherwise, "Microsoft's competitors could unjustly gain access to Microsoft's business strategies and initiatives related to diversity at Microsoft's expense" and "use the information in recruiting efforts against the company."

- Microsoft—like IBM—is concerned that disclosure of such confidential diversity information could result in real and direct harm to its business:  if not protected under

2

seal, Microsoft insisted, this material "would give competitors direct, accurate information as to Microsoft's diversity and inclusion strategies, and the results of those strategies (both what is working and what is not), which competitors could use in developing their own strategies."

McIntyre plans to leave IBM and join Microsoft with first-hand knowledge of the same kind of "confidential and sensitive information" that Microsoft declared "would place Microsoft at a competitive disadvantage" because, *inter alia*, it could be used by competitors to recruit against Microsoft and to develop their own diversity strategies. Like Microsoft, IBM has guarded the secrecy of its own diversity data, strategies, and initiatives. For example, IBM opposed Freedom Of Information Act requests for the disclosure of this confidential information on the basis that disclosure would expose the Company to competitive harm. The United States Department of Labor agreed, and permitted IBM to keep its confidential diversity information secret.

McIntyre knows this confidential information regarding IBM's diversity representation data. McIntyre also led a confidential IBM initiative to identify, target, and devise plans to recruit more than 50 top diverse external candidates for specific executive positions at the Company. She knows which external diverse executive candidates IBM is pursuing; where IBM is in the process of targeting, recruiting, interviewing, and placing those candidates; and what positions IBM is seeking to fill (or create) for those candidates—all of which would be helpful to Microsoft as it competes against IBM by trying to improve the diversity of its own leadership and workforce. McIntyre also possesses IBM trade secrets regarding proprietary methodologies and technologies, designed and used by IBM exclusively in-house, that deploy Artificial Intelligence and algorithms to help IBM extract the most value from its diverse talent pipeline, monitor diversity metrics, and incentivize business managers to meet diversity goals.

Under New York law, McIntyre's Noncompetition Agreement should be enforced to protect IBM against the competitive disadvantage threatened by McIntyre's breach of her Noncompetition Agreement.  Each of the elements required for injunctive relief under the "inevitable disclosure" test is satisfied here:  (1) IBM and Microsoft are direct competitors; (2) McIntyre's proposed new position is identical to her old one and, therefore, she cannot reasonably be expected to fulfill her new job without utilizing (whether intentionally or not) the IBM business secrets she knows; (3) the IBM secrets at issue would be valuable to competitors including Microsoft; and (4) the competitively sensitive nature of that information is such that it would cause harm to IBM if—as Microsoft said of its own diversity information—IBM's "competitors could unjustly gain access to [IBM's] business strategies and initiatives related to diversity."[1]

If McIntyre is permitted to become the executive in charge of diversity for Microsoft without first abiding by her Noncompetition Agreement with IBM, Microsoft will not merely "unjustly gain access" to IBM's diversity secrets, it will unjustly gain the IBM executive with the most responsibility for and knowledge of those secrets.

In addition to being IBM's Chief Diversity Officer, McIntyre also was responsible for IBM's executive succession planning.  In this role, McIntyre tracked, developed, and planned for the placement of hundreds of IBM executive candidates, including diverse candidates. McIntyre was responsible for developing plans to place candidates into the highest executive ranks of the Company, exposing her to competitively sensitive secrets about the Company's corporate strategies.

---

[1]   *See IBM Corp.* v. *Papermaster*, No. 08-CV-9078 (KMK), 2008 WL 4974508, at *6 (S.D.N.Y. Nov. 21, 2008) (listing factors under inevitable disclosure analysis).

Given what she knows about IBM's confidential diversity data, strategies and initiatives and other proprietary information, the Court should enter a temporary restraining order and preliminary injunction prohibiting McIntyre from accepting employment at Microsoft as Chief Diversity Officer until she waits the twelve months she agreed to wait.

## STATEMENT OF FACTS

A full statement of the facts regarding McIntyre, her responsibilities in her former role at IBM, her departure from IBM, and the competition between IBM and Microsoft is set forth in the declaration of Diane J. Gherson, Senior Vice President and Chief Human Resources Officer at IBM, dated February 2, 2018, and the declaration of Pietro J. Signoracci, counsel for IBM, dated February 11, 2018.

### The Competition Between IBM and Microsoft, Especially in Diversity

IBM and Microsoft compete for the same business and government customers. They market computer hardware, software, and services offerings that compete directly against each other in many areas of information technology ("IT"), including Cloud Computing, Artificial Intelligence, Global Business Services, Enterprise Server and Storage Systems, and IBM Blockchain.  (*See* Declaration of Diane J. Gherson dated February 11, 2018 ("Gherson Decl.") ¶ 27.)  Microsoft is listed in IBM's financial disclosures as among IBM's top "broad based competitors" in IBM's global services business and among IBM's "principal competitors" in the highly competitive enterprise management software market.[2]  Likewise, IBM is listed in Microsoft's financial disclosures as a competitor in enterprise-wide computing systems; server applications; database, business intelligence, and data warehousing solutions; system

---

[2]    International Business Machines Corp., Annual Report (Form 10-K) (Feb. 23, 2016), at pp. 10–11, www.sec.gov/Archives/edgar/data/51143/000104746916010329/a2226548z10-k.htm.

management solutions; products for software developers; and Azure, Microsoft's cloud computing offering.[3]  (*See* Gherson Decl. ¶ 28.)

Most relevant here, IBM and Microsoft also compete head-to-head in the fierce competition to recruit and retain the top talent in the IT industry,[4] especially diverse talent (*i.e.*, candidates who bring to the workplace a diversity of thought, experience, and background, including race, ethnicity, gender, sexual orientation, or disability status, among others).  Recent press articles discuss IBM's trend-setting diversity recruitment initiatives, and Microsoft's attempts to catch up to IBM in the competition for diverse talent.[5]  In response to increasing pressure to improve its performance on diversity and equality issues, Microsoft has announced and implemented various diversity and inclusion initiatives and has promised to allocate more than $55 million per year to develop innovative diversity and equality programs.[6]  (*See* Gherson Decl. ¶ 29.)

For both IBM and Microsoft, having a diverse workforce is not just ethically sound, and not just a mere recruiting strategy.  IBM has long demonstrated that a diverse workforce is critical to the quality, innovation and competitive strength of its products and

---

[3]   Microsoft Corp., Annual Report (Form 10-K) (July 28, 2016), at pp. 7–8, https://www.sec.gov/Archives/edgar/data/789019/000119312516662209/d187868d10k.htm.

[4]   *Id.* at p. 24 ("The market for highly skilled workers and leaders in our industry is extremely competitive.").

[5]   *See, e.g.*, Black Enterprise, *Intel and IBM Set the Diversity Example for Technology and for Us All* (Mar. 18, 2016), http://www.blackenterprise.com/intel-and-ibm-set-the-diversity-example-for-technology-and-for-us-all/ (explaining that "IBM was concerned with diversity in technology long before it became a much-discussed topic" and "other companies include Apple, Google, and Microsoft, which are also launching diversity initiatives and programs, especially ones that support young people of color in pursuing STEM careers.") The article also notes that "former IBM salesman and now Microsoft chairman John Thompson spoke recently about the support he received from IBM when he faced racism from clients as a salesman on the road."  *Id.*

[6]   *See* Microsoft's Opposition to Plaintiffs' Motion for Class Certification at 1, 10–12, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash Jan. 5, 2018) (Dkt. No. 285); *see* Declaration of Pietro J. Signoracci ("Signoracci Declaration") Exhibit 15.

services, particularly against Microsoft.[7]  Diversity is a competitive necessity, not only because it

is important to customers and business partners, but also because it drives and enhances product

innovation and quality.  IBM measures its products, services, and diversity hiring initiatives

against those offered by Microsoft, and reports publicly on instances when customers choose

IBM over Microsoft.[8]  (*See* Gherson Decl. ¶ 30.)

    For its part, Microsoft has publicly acknowledged that successful diversity and

inclusion efforts are essential to its competitive success, stating that "diversity [and] inclusion is

a business imperative for Microsoft" and "a diverse workforce brings a blend of perspectives and

experiences that spark greater innovation, customer satisfaction, employee productivity, and

corporate profitability."[9]  Microsoft also concedes, as is relevant here, that diversity hiring is

extremely competitive and high-stakes:  "Microsoft actively seeks to foster greater diversity in

its workforce, and to recruit top diverse talent in a highly competitive labor market.  Otherwise,

Microsoft could risk lack of key market representation; impact to innovation; lack of diverse

talent pipeline, [and] high attrition and onboarding cost."[10]  Academic studies and industry

---

[7] *See, e.g.*, IBM, *For More Diversity in AI, a Look to the Next Generation* (Sept. 18, 2017), https://www.ibm.com/blogs/insights-on-business/ibmix/diversity-ai-look-next-generation/ (explaining IBM's view that a gender-imbalanced workforce limits the applications of the AI it develops because "AI reflects the human biases of its creators"); GeekWire, *IBM in the Cloud: Inside the Tech Giant's Quest to Stand Out Against Amazon, Microsoft, and Google* (Mar. 23, 2017), https://www.geekwire.com/2017/ibm-cloud-inside-tech-giants-quest-compete-amazon-microsoft-google/ (IBM "has a different view than others" on its AI approach"); Fortune, *Microsoft CEO Satya Nadella Has Much to Say About Artificial Intelligence* (Sept. 27, 2016), http://fortune.com/2016/09/26/microsoft-satya-nadella-artificial-intelligence/ ("'We are not pursuing A.I. to beat humans at games,' said Nadella, taking a subtle hit at competitors like Google and IBM . . . . Microsoft's overarching goal is to 'democratize A.I.'").

[8] *See* IBM News Releases, *Workday taps IBM Cloud for development and testing* (Aug. 17, 2016) (promoting article noting that Workday, a company specializing in Human Resources software, selected IBM over Microsoft as its cloud services partner for a multi-year deal), https://www.ibm.com/blogs/cloud-computing/2016/08/workday-softlayer-development-testing/.

[9] Microsoft's Response to Plaintiffs' Motion to Seal at 5, *Moussouris* v. *Microsoft*, No. 2:15-cv-01483 (W.D. Wash. Apr. 12, 2017) (Dkt. No. 177) (Signoracci Decl. Ex. 3) (hereinafter "Microsoft April 2017 Brief").

[10] *Id.*

commentary confirm that when companies succeed in competition for diverse talent, they are more likely to succeed in their competition for customers' business.[11]   (*See* Gherson Decl. ¶ 32.)

McIntyre herself is well aware of the importance of diversity initiatives and strategies in gaining a competitive edge in the IT industry.  In an internal IBM presentation she prepared regarding the "critical business imperative" of building and maintaining a diverse workforce "to maximize IBM's profit margin," McIntyre wrote:  "[T]he more diverse the population, the greater the innovative solutions, *the wider the lead*."  (*Id.* ¶ 32.)  McIntyre is now poised to take with her to Microsoft the confidential and competitively sensitive diversity information she gained as IBM's Chief Diversity Officer to help Microsoft try to take the lead.

---

[11]   *See, e.g.*, Vivian Hunt, Dennis Layton & Sara Prince, McKinsey & Company, *Diversity Matters* (2015) (diversity study examining the relationship between the level of diversity and company financial performance using proprietary data sets for 366 public companies across a range of industries, including technology, in Canada, Latin America, the United Kingdom, and the United States, and finding that "[c]ompanies in the top quartile for racial and ethnic diversity are 35 percent more likely to have financial returns above their respective national industry medians"; that "[c]ompanies in the top quartile for gender diversity are 15 percent more likely to have financial returns above their respective national industry medians"; and that "more diverse companies . . . are better able to win top talent and improve their customer orientation, employee satisfaction, and decision making, leading to a virtuous cycle of increasing returns"); *see also* Julia Dawson, Richard Kersely & Stefano Natella, Credit Suisse Research Institute, *The CS Gender 3000: Women in Senior Management* (2014) (diversity study identifying and mapping more than 28,000 senior managers at over 3,000 companies and finding that companies with higher female representation at the board level or in top management exhibit higher returns on equity, higher valuations, and also higher payout ratios); Sheen S. Levine et. al., *Ethnic Diversity Deflates Price Bubbles*, 111 PNAS 52 (Dec. 30, 2014) (a diversity and homogeneity study finding that price bubbles in markets often arise not only from individual errors or financial conditions, but also from the social context of decision making, suggesting that diversity leads to more scrutiny and challenging of decisions and ideas, less overconfidence and better outcomes for businesses).

Microsoft's CEO, Satya Nadella, has also emphasized the value of diversity in competing for business.  *See* Exhibit A to Declaration of Anne B. Shaver in Support of Plaintiffs' Motion to Certify Class at 6–7, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash.) (Dkt. No. 233-1) (Signoracci Decl. Ex. 10) (letter from Satya Nadella to all Microsoft Employees). In his letter, Nadella states:

> [W]e need to recruit more diverse talent to Microsoft at all levels of the company.  As you saw in the numbers we recently released, we have work to do at Microsoft . . . .  These numbers are not good enough, especially in a world in which our customers are diverse and global.  To achieve this goal—especially in engineering—we will have to expand the diversity of our workforce at the senior ranks and re-double our efforts in college and other hiring.

**McIntyre's Responsibilities as Chief Diversity Officer at IBM**

Throughout her 20-year career at IBM, McIntyre held various executive positions. In 2010, McIntyre was promoted to the position of Vice President in Human Resources. In 2015, she became Chief Diversity Officer and Vice President, Leadership Succession Planning. As IBM's Chief Diversity Officer, McIntyre was responsible for, among other things:

- Monitoring and delivering presentations regarding confidential data about diverse representation in every segment of IBM's workforce;

- Overseeing a confidential initiative to identify, target, and devise plans to recruit more than 50 top diverse external candidates for executive positions at the Company;

- Devising and implementing IBM's competitive and proprietary strategies to recruit and retain diverse talent and to develop IBM's existing talent pipeline for potential promotion within the Company;

- Influencing the design and overseeing the development and implementation of proprietary (and non-public) software IBM uses internally to identify, track, and place the Company's most qualified diverse candidates into executive level positions. This proprietary methodology, which IBM designed and uses exclusively in-house, deploys Artificial Intelligence and algorithms to help IBM extract the most value from its diverse talent pipeline, which in turn improves the Company's performance across all of its business segments; and

- Overseeing the development of IBM's proprietary methodologies for monitoring diversity metrics in its business units and incentivizing business managers to meet their diversity goals. These accountability measurement methodologies were designed and used exclusively in-house, are unique to IBM, and have significantly contributed to IBM's competitiveness in the IT industry. (*Id.* ¶¶ 18–21.)

In her role as the Vice President of IBM's Leadership Succession Planning, McIntyre became further involved in tracking, developing, and placing all candidates for executive positions in the Company.  McIntyre oversaw confidential projects to develop Artificial Intelligence-based tools that the Company designed in-house and used internally for these purposes.  As IBM's Chief Diversity Officer, McIntyre had a particular focus on diverse executive candidates and placements.  Accordingly, McIntyre knows confidential information about IBM's executive succession planning technologies and strategies, including the identities, statuses, and prospects of IBM's top diverse talent.  (*Id.* ¶ 22.)

The materials McIntyre prepared and reviewed in the course of performing her duties as Chief Diversity Officer confirm that she was intimately knowledgeable about the Company's most sensitive diversity information, including discussions about IBM's strengths and competitive strategies against its major competitors, specifically with respect to data about diverse representation in every segment of IBM's workforce and detailed information about the targeting, recruitment, and retention of diverse talent.  McIntyre was also personally involved in identifying specific diverse candidates for IBM's corporate management and in planning the succession and promotion of IBM executives generally.  (*Id.* ¶ 24.)

This highly confidential information will remain relevant and competitively sensitive throughout 2018 and into 2019.  McIntyre regularly participated in meetings to discuss products and initiatives under development—often under her direct supervision—including information regarding diversity initiatives that IBM has not yet launched or publicly announced that will enable IBM to better compete to recruit, retain, and develop diverse talent.  For example, McIntyre personally oversaw the teams responsible for developing a Cognitive-based tool (*i.e.*, Artificial Intelligence) designed to track career development and recommend growth

opportunities and potential paths for promotion.  McIntyre knows the proprietary technological components of this tool; she knows confidential information about where IBM is in the process of developing and internally deploying the tool; and she would be able to lead a team at a competitor to build a similar product to improve that company's diversity initiatives, placement processes, and overall performance—and, potentially, to market the tool commercially.  (*Id.* ¶ 25)

**Microsoft Defends a Gender Discrimination Class Action in Which**
**It Zealously Guards Its Diversity Data, Initiatives and Strategies**

In recent years, Microsoft has come under scrutiny for its lack of diversity and its allegedly discriminatory employment practices.  In 2014, Microsoft's CEO, Satya Nadella, appeared at the annual Grace Hopper Celebration of Women in Computing.  When asked to offer advice to women who are not comfortable asking for a pay raise, Nadella responded:  "It's not really about asking for the raise, but knowing and having faith that the system will actually give you the right raises as you go along."  Nadella added:  "And that, I think might be one of the additional superpowers that quite frankly women who don't ask for a raise have.  Because that's good karma."[12]  Nadella's comments were met with outrage online and negative press reports about Microsoft's allegedly discriminatory employment practices.[13]  Nadella subsequently attempted to walk back his views in an email to employees, claiming that "the overall difference in base pay among genders and races (when we consider level and job title) is consistently within

---

[12]   *See* Plaintiff's Motion for Class Certification at 13 n.30, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash Oct. 27, 2017) (Dkt. No. 232) (Signoracci Decl. Ex. 9); *see also* Forbes, *'Karma' Hasn't Fixed These Three Facts About the Gender Pay Gap* (Oct. 10, 2014), https://www.forbes.com/sites/ruchikatulshyan/2014/10/10/karma-hasnt-fixed-these-three-facts-about-the-gender-pay-gap/#61c303a3c08d.

[13]   CBS News, *Microsoft CEO blasted over remarks on women's pay* (Oct. 10, 2014), https://www.cbsnews.com/news/microsoft-ceo-satya-nadella-blasted-over-remarks-on-womens-pay/.

0.5% at Microsoft."  This only stimulated further criticism, as Microsoft employees responded that Nadella's presentation did not address the company's alleged failure to promote women to higher level positions, even when those women were doing the same jobs as their male employees who had more senior titles and higher salaries.[14]

Nadella's statements in 2014 jump-started a conversation about the lack of diversity and equality at Microsoft.  Microsoft also received public criticism for its lack of progress after the company chose to release some of its diversity statistics in 2015.[15]  One publication rated Microsoft as the worst tech giant in both female employment percentage and promoting women into leadership roles.[16]

Then, in September 2015, a group of Microsoft employees filed a class action complaint against Microsoft, *Moussouris* v. *Microsoft Corporation*, alleging that Microsoft engaged in a pattern of discrimination against female technical employees in performance evaluations, compensation, and promotions.[17]  In public, Microsoft employees accused the company of promoting a "Boy's Club" atmosphere, and even employees in Microsoft's Human

---

[14]   *See* Plaintiffs' Motion for Class Certification, *supra* note 12, at 13–14.

[15]   *See* Marco della Cava, *Microsoft 2015 Diversity Numbers Flat, Women Fall*, USA Today (Nov. 23, 2015), https://www.usatoday.com/story/tech/2015/11/23/microsoft-2015-diversity-numbers-flat-women-fall/76273440/ (noting that female employment at Microsoft fell from 29% in 2014 to 26.8% in 2015); Wired, *Microsoft Releases More Diversity Stats, and They Aren't Pretty* (Jan. 5, 2015), https://www.wired.com/2015/01/microsoft-diversity/ ("The new statistics released by Microsoft are disappointing at best. . . .  Comparing Microsoft's numbers from last year to this year, the new report also shows that Microsoft is indeed working to close diversity gaps.  But it's doing so at a snail's pace.").

[16]   The Verge, *How Do Tech's Biggest Companies Compare on Diversity* (Aug. 20, 2015), https://www.theverge.com/2015/8/20/9179853/tech-diversity-scorecard-apple-google-microsoft-facebook-intel-twitter-amazon.

[17]   Second Amended Compl. ¶ 1, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash. Apr. 6, 2016) (Dkt. No. 55) (Signoracci Decl. Ex. 2).

Resources department "acknowledge[d] that Microsoft's [diversity and inclusion] initiatives are little more than window dressing . . . ."[18]

In April 2017, in connection with discovery in the *Moussouris* class action, plaintiffs sought to file on the public docket certain internal communications and documents regarding Microsoft's diversity data, strategies, and initiatives, which Microsoft had produced in discovery under a confidentiality designation.  In response, Microsoft took the position that the information was not merely confidential, but so sensitive and potentially damaging to Microsoft if revealed to its competitors (*e.g.*, IBM), that the court should take the extraordinary measure of putting the information under seal.

Microsoft asserted that the diversity exhibits contained "confidential business information which, if disclosed, could cause competitive harm to Microsoft."[19]  Microsoft explained that this information is "closely-held," "available to a very small audience within Microsoft," and guarded by "strict internal confidentiality procedures."[20]  Microsoft argued that this material should either remain sealed or be produced with redactions because, if disclosed, "Microsoft's competitors could unjustly gain access to Microsoft's business strategies and

---

[18]  *See* Plaintiff's Motion for Class Certification, *supra* note 12, at 19–20, 27.

[19]  *See* Microsoft April 2017 Brief, *supra* note 9, at 2, 4–6.

[20]  *Id.*  Microsoft repeated these arguments in subsequent briefing in the *Moussouris* Class Action, describing "confidential and sensitive information regarding Microsoft's public relations and communications strategies, along with information regarding internal business operations and internal discussion regarding the company's competitors, all of which would place Microsoft at a disadvantage if made public."  *See* Microsoft's Response to Plaintiffs' Motion to Seal at 2, 4–6, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash. July 26, 2017) (Dkt. No. 220) (Signoracci Decl. Ex. 7) (hereinafter "Microsoft July 2017 Brief"); Declaration of Dev Stahlkopf in Support of Microsoft's Response to Plaintiffs' Motion to Seal at ¶¶ 3–4, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash. July 26, 2017) (Dkt. No. 222) (Signoracci Decl. Ex. 8); *see also* Microsoft's Response to Plaintiffs' Motion to Seal at 2–4, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash. July 12, 2017) (Dkt. No. 209) (Signoracci Decl. Ex. 5); Declaration of Dev Stahlkopf in Support of Microsoft's Response to Plaintiffs' Motion to Seal at ¶¶ 3–4, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash, July 12, 2017) (Dkt. No. 211) (Signoracci Decl. Ex. 6).

initiatives related to diversity at Microsoft's expense and may use the information in recruiting efforts against the company."[21]  Microsoft argued—and the *Moussouris* Court agreed—that there was "good cause" to seal these exhibits because of "the prospective competitive harm" that would flow from dissemination of certain information regarding Microsoft's diversity data, strategies, and initiatives.[22]

In July 2017, in connection with its efforts to keep under seal internal communications about a 2016 Equal Pay Study Microsoft published, Microsoft again argued to the *Moussouris* court that its diversity and inclusion data and strategy are "non-public, highly sensitive, confidential, and private."[23]  Microsoft explained that it "maintains strict internal confidentiality policies so as to limit distribution of communications like those referenced in [the Exhibit]."[24]

In December 2017, in connection with plaintiffs' motion for class certification in the *Moussouris* action, Microsoft filed additional briefing arguing that, beyond "good cause," there are "compelling reasons" to keep its confidential information regarding diversity data, strategies, and initiatives under seal.[25]  Microsoft argued that the court should seal confidential information "reflecting the company's efforts to consider new perspectives and identify actionable pathways forward for positively impacting the complex challenge of gender inclusion and diversity in the technical field," as such information "gives Microsoft an advantage over

---

[21]  Microsoft July 2017 Brief, *supra* note 20, at 3–4.

[22]  *Id.*

[23]  Stahlkopf July 26, 2017 Decl., *supra* note 20, at ¶¶ 3–4.

[24]  *Id.*

[25]  *See* Microsoft's Sur-reply to Plaintiffs' Motion to Seal at 4–5, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash. Dec. 15, 2017) (Dkt. No. 280) (Signoracci Decl. Ex. 13) (hereinafter "Microsoft December 2017 Brief").

competitors."[26]  Microsoft made clear the risk that competitors would use this information, if

published, to their benefit and to Microsoft's detriment:  "Unsealing these materials would give

competitors direct, accurate information as to Microsoft's diversity and inclusion strategies, and

the results of those strategies (both what is working and what is not), which competitors could

use in developing their own strategies."  Microsoft explained that "this is an especially acute

concern" in the context of "the highly competitive tech industry where the same companies are

competing for the same talent, the minority of which is female."[27]

        In January 2018, Microsoft made another motion to seal documents it intended to

rely on in opposing class certification.  Microsoft argued that the court should seal documents

containing "confidential information reflecting Microsoft's philosophy, strategies, and

techniques for evaluating employee performance and approaching compensation and

promotion," because such "documents describe processes developed by and for Microsoft

management to further its ability to meet strategic objectives and advance its competitive

interests, both from a business perspective and to attract and retain employees."[28]  Microsoft also

argued, again, that the "[c]onfidential diversity and inclusion strategies that Microsoft uses to its

competitive advantage" should remain under seal.[29]  Microsoft emphasized that its diversity and

inclusion data and strategy are "non-public, highly sensitive, confidential, and private, both

---

[26]   *Id.* at 4.

[27]   *Id.* at 4.

[28]   *See* Microsoft's Motion to Seal Documents Submitted in Support of Its Opposition to Plaintiffs' Motion for
Class Certification at 4, *Moussouris* v. *Microsoft*, No. 2:15-cv-01483 (W.D. Wash. Jan. 5, 2018) (Dkt. No. 283)
(Signoracci Decl. Ex. 14) (hereinafter "Microsoft January 2018 Brief").

[29]   *Id.*

internally and externally."[30]  Microsoft also explained that "[i]n furtherance of its efforts to
maintain the confidentiality of diversity information, Microsoft expends considerable efforts to
ensure that such information is not publicly disclosed."[31]

   The sealing order from the court in *Moussouris* is itself under seal but, as
reflected on the docket, the district court has granted multiple motions by Microsoft to keep its
confidential documents under seal and to have certain filings appear on the public docket only in
redacted versions.[32]

   Thus, in the *Moussouris* action, Microsoft has conceded—indeed, asserted—that
each of the categories of confidential information that McIntyre possesses is competitively
sensitive and, if disclosed, would be used by competitors to do harm:

   <u>Diversity Representation Data</u>:  According to Microsoft, diversity representation
data is competitively sensitive:  "data regarding diversity metrics, along with confidential
information concerning related strategy and analytics" should be sealed to prevent "the
prospective competitive harm flowing from dissemination."[33]  Microsoft Head of Diversity &
Inclusion Shinder Dhillon testified that harm from use of its diversity data "could include, among
other things, an attempt by outsiders to make uninformed conclusions about the cause, meaning
or significance of the data, which could cause unnecessary disruption to Microsoft's business or

---

[30] Declaration of Shinder Dhillon in Support of Microsoft's Opposition to Plaintiffs' Motion for Class
Certification at ¶¶ 19–20, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash. Jan. 5, 2018)
(Dkt. No. 296) (Signoracci Decl. Ex. 16).

[31] *Id.*

[32] *See Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash. July 27, 2017) (Dkt. No. 223)
(granting motions to seal documents).

[33] Microsoft April 2017 Brief, *supra* note 9, at 4.

improperly confuse and/or influence Microsoft's customers, employees, or potential employee applicants."[34]

Confidential Recruiting Strategies:  According to Microsoft, "Microsoft's competitors could unjustly gain access to Microsoft's business strategies and initiatives related to diversity at Microsoft's expense and may use the information in recruiting efforts against the company."[35]

Proprietary, Non-Public Diversity Technologies and Initiatives:  According to Microsoft, knowledge of its diversity strategies "would give competitors direct, accurate information as to Microsoft's diversity and inclusion strategies, and the results of those strategies (both what is working and what is not), which competitors could use in developing their own strategies" and that "[i]n the highly competitive tech industry where the same companies are competing for the same talent, the minority of which is female, this is an especially acute concern."[36]

---

[34]   Declaration of Shinder Dhillon in Support of Microsoft's Response to Plaintiffs' Motion to Seal at ¶ 5, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash. Nov. 29, 2017) (Dkt. No. 272) (Signoracci Decl. Ex. 12).

[35]   Declaration of Shinder Dhillon in Support of Microsoft's Response to Plaintiffs' Motion to Seal at ¶ 6, *Moussouris* v. *Microsoft Corporation*, No. 2:15-cv-01483 (W.D. Wash. Apr. 12, 2017) (Dkt. No. 178) (Signoracci Decl. Ex. 4); *see also* Microsoft April 2017 Brief, *supra* note 9, at 5; Dhillon Jan. 5, 2018 Decl., *supra* note 30, at ¶ 19.

[36]   *See* Microsoft December 2017 Brief, *supra* note 25, at 4; Dhillon Nov. 29, 2017 Decl., *supra* note 34, at ¶ 4. *See also* Microsoft January 2018 Brief, *supra* note 28, at 4 ("Sensitive and confidential business information . . . which gives Microsoft an advantage over competitors and, if publicly revealed, could harm its business interests . . . includes: Detailed and specific confidential information reflecting Microsoft's philosophy, strategies, and techniques for evaluating employee performance and approaching compensation and promotion.")

      <u>Confidential, High-Level Succession Planning</u>:  Microsoft has <u>vouched</u> for the competitive importance of succession planning in its 10-K:  "Effective succession planning is also important to our long-term success."[37]

**McIntyre's Noncompetition Agreement with IBM**

      Precisely because of her exposure to highly confidential and commercially sensitive information regarding IBM's diversity data, strategies and initiatives, McIntyre was one of IBM's senior executives who the Company asked to sign a noncompetition agreement, to restrict the potential disclosure of confidential IBM information in the event that she left the Company.

      McIntyre executed her Noncompetition Agreement with IBM on January 25, 2012 (the "Noncompetition Agreement," a copy of which is attached as Exhibit A to the Complaint in this action).  In that agreement, McIntyre acknowledged and agreed that:

> during [her] employment with IBM and for twelve (12) months following the termination of [her] employment . . . , [she] will not directly or indirectly within the "Restricted Area" (i) "Engage in or Associate with" (a) any "Business Enterprise" or (b) any competitor of the Company; or (ii) solicit, for competitive business purposes, any customer of the Company with which [she was] directly or indirectly involved as part of [her] job responsibilities during the last twelve (12) months of [her] employment with IBM.  (Noncompetition Agreement § 1(c)(i), 1(c)(ii).)

      The Noncompetition Agreement provides the following definitions for the defined terms in the foregoing provision:

      (a)    "Restricted Area" is defined as "any geographic area in the world in which [she] worked or for which [she] had job responsibilities during the last twelve (12) months of [her] employment with IBM."  (*Id*. § 2(d).)

---

[37]  Microsoft Corp., Annual Report (Form 10-K) (July 28, 2016) at p. 23, https://www.sec.gov/Archives/edgar/data/789019/000119312516662209/d187868d10k.htm.

(b)      "Engage in or Associate with" is defined to mean, among other things, acting as an "associate, employee, member, consultant, or contractor."  (*Id*. § 2(c).)

(c)      "Business Enterprise" is defined as "any entity that engages in, or owns or controls an interest in any entity that engages in, competition with any business unit or division of the Company in which [she] worked at any time during the three (3) year period prior to the termination of [her] employment." (*Id*. § 2(a).)

The Noncompetition Agreement also defines "IBM confidential information" as including, among other things, "the Company's methods, information, systems, plans for acquisition or disposition of products, expansion plans, financial status and plans, customer lists, client data, personnel information and trade secrets of the Company," as well as "the Company's unique selling, manufacturing and servicing methods and business techniques, training, service and business manuals, promotional materials, training courses and other training and instructional materials, vendor and product information, customer and prospective customer lists, other customer and prospective customer information and other business information."  (*Id*. § 1(a), § 1(b).)

Additionally, in the Noncompetition Agreement, McIntyre agreed and acknowledged that:

(a)      "the business in which IBM and its affiliates are engaged is intensely competitive" (*Id*. § 1(a).);

(b)      her "employment by IBM has required . . . that [she] have access to, and knowledge of, confidential information of the Company" (*Id.*);

(c)      "the Company would suffer irreparable harm if [she failed] to comply with [the noncompetition and the nonsolicitation covenants]" (*Id.* § 3.); and

(d)      "the restrictions set forth in [the noncompetition and the nonsolicitation covenants] are reasonable as to geography, duration and scope."  (*Id.*).

In sum, McIntyre agreed in the Noncompetition Agreement that, for a period of one year following the termination of her employment from IBM, she would not work for any competitor of IBM in any geographic area in the world for which she had job responsibilities in the last twelve months of her employment with IBM, and she would not directly or indirectly solicit, for competitive business purposes, any customer of the Company with which she was directly or indirectly involved in the last year of her employment with IBM.  McIntyre made this promise to protect IBM's confidential information and to prevent a situation where her employment by a competitor would result in the intentional or unintentional use or disclosure of IBM confidential information to which she was exposed in her IBM employment.  McIntyre's proposed employment at Microsoft as Chief Diversity Officer violates this obligation:  Microsoft directly competes with the business unit at IBM in which McIntyre worked prior to the termination of her employment.

**McIntyre Violates the Noncompetition Agreement**
**by Accepting Employment with Microsoft as Its Chief Diversity Officer**

Notwithstanding the promises she made in her Noncompetition Agreement, McIntyre told IBM on Sunday, January 14, 2018 that she intended to leave her job as *IBM's* Chief Diversity Officer and accept a job as *Microsoft's* Chief Diversity Officer, without waiting the twelve-month period she agreed would be reasonable.  IBM subsequently learned that McIntyre intended to commence employment with Microsoft immediately, on January 30,

2018.[38]  (*See* Declaration of Pietro J. Signoracci dated February 11, 2018 ("Signoracci Decl.") ¶¶ 19, 28, 31.)

      McIntyre's announcement of her resignation and immediate plans to compete directly against IBM was a surprise to the Company.  Just two days before she told IBM of her plans, IBM had internally announced on its intranet, on January 12, 2018, that effective February 1, 2018, McIntyre would receive a promotion with increased pay, an expanded role, and appointment to IBM's selective Growth & Transformation Team, a leadership group of about 300 high-level executives from all areas of IBM tasked with solving critical challenges and focusing on transforming the Company and its strategies.  (*See* Gherson Decl. ¶ 16.)  What IBM knows now, however, is that while she was negotiating her promotion at IBM and working with the Company's Communications team to prepare the internal announcement of her future at IBM, McIntyre was meeting with Microsoft's top executives and negotiating a competitive offer from Microsoft.  In fact, McIntyre visited Microsoft's offices on January 10, 2018, after IBM had informed her of her promotion.  And on January 12, 2018, the same day that IBM internally announced McIntyre's promotion, McIntyre accepted Microsoft's offer to become its Chief Diversity Officer—and to take with her to Microsoft all of her knowledge of IBM's diversity data, strategies, and initiatives.  (*Id.*)

      Just as they were vital to her role as IBM's Chief Diversity Officer, the confidential IBM diversity data, strategies and technologies McIntyre knows, and the IBM customers, partners, and potential diversity recruits McIntyre knows by virtue of her responsibilities as IBM's Chief Diversity Officer, will all be relevant in performing her responsibilities in the proposed role as Microsoft's Chief Diversity Officer, reporting directly to

---

[38]    Since then, the parties have negotiated for McIntyre not to commence employment at Microsoft until February 13, 2018.

Kathleen Hogan, Microsoft's Chief People Officer and Executive Vice President of Human Resources.  Indeed, the job that McIntyre intends to take at Microsoft is identical to, and in direct competition against, the job she held at IBM.  McIntyre intends to move from the leadership of IBM's diversity strategy, recruitment, and retention team to the leadership of Microsoft's diversity strategy, recruitment, and retention team.  Her proposed role at Microsoft would involve her in the development and implementation of Microsoft's competitive strategies to compete against IBM, including with respect to recruiting and retaining diverse talent in the IT industry and using those diversity initiatives to compete against IBM for customers.

Microsoft itself admitted in its briefing in *Moussouris* that a competitor with knowledge of the valuable confidential information of exactly the type that McIntyre possesses—diversity data, strategies, methodologies, and initiatives—would use that information to the company's detriment.  *See* Microsoft's April 2017 Brief, *supra* note 9, at 6 ("The materials sought to be kept under seal have little value *other than to Microsoft's competitors*, who stand to gain from publication of this information at Microsoft's expense." (emphasis added)).

McIntyre's defection to Microsoft poses a particular competitive threat to IBM, not only because she knows the Company's trade secrets, but also because she developed relationships with significant IBM customers and partners on the strength of IBM's goodwill, products, and services, and served as the public face of IBM at major industry events as IBM's highest ranking customer goodwill representative.  (*See* Gherson Decl. ¶ 35.)

McIntyre's breach of her Noncompetition Agreement is especially serious, and unnecessary, considering that she could find high level executive employment at any number of companies that do not compete directly against IBM in the very business for which McIntyre was responsible.  With her skills and experience as an executive in the Human Resources

department of a Fortune 100 company, and as IBM's Chief Diversity Officer for the past two and a half years, McIntyre is marketable for high ranking executive positions at companies that do not compete directly against IBM.  Today, every sizable business, financial institution, insurance company, law firm, consulting firm, and non-profit organization is in need of a diversity officer. While Microsoft's diversity needs may be acute, they are not unique.  Indeed, McIntyre informed IBM that she had considered, but rejected, an opportunity at a company in the food services industry.  (*Id.* ¶ 33.)

On February 10, 2018 at 7:46 a.m., counsel for IBM advised Sarah Bouchard of Morgan Lewis & Bockius LLP, and Michael Delikat of Orrick, Herrington & Sutcliffe LLP, counsel for McIntyre, that IBM would seek a temporary restraining order from this Court on February 12, 2018, to enjoin McIntyre from commencing employment with Microsoft prior to the expiration of the restrictive period in her Noncompetition Agreement.  (*See* Signoracci Decl. ¶ 33.)

## ARGUMENT

McIntyre should be enjoined from commencing her proposed employment as Chief Diversity Officer of Microsoft during her twelve-month noncompetition period.  Both a temporary restraining order and a preliminary injunction are appropriate here because IBM can demonstrate "'(1) that [it] will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor.'"  *IBM Corp.* v. *Papermaster*, No. 08-CV-9078 (KMK), 2008 WL 4974508, at *6 (S.D.N.Y. Nov. 21, 2008) ("*Papermaster*") (quoting *Lusk* v. *Vill. Of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007)).

23

## I.     IBM WILL SUFFER IRREPARABLE INJURY ABSENT INJUNCTIVE RELIEF

IBM and Microsoft are direct competitors both in the provision of IT products and services and in the competition for diverse talent—especially in the competition to recruit women and other diverse candidates for executive level positions.  Microsoft has acknowledged that successful diversity and inclusion efforts are essential to competitive success, stating that "diversity [and] inclusion is a business imperative for Microsoft" and "a diverse workforce brings a blend of perspectives and experiences that spark greater innovation, customer satisfaction, employee productivity, and corporate profitability."  Microsoft April 2017 Brief, *supra* note 9, at 5.

If it was so likely, and so inevitable, that Microsoft's diversity information and strategies would be used by its competitors to Microsoft's detriment if they were not shielded from public disclosure in the *Moussouris* action, then it is likely inevitable that the person with the most knowledge of the same information and strategies at IBM—IBM's Chief Diversity Officer, McIntyre—will use, rely on, or divulge IBM's equally secret and sensitive information (whether intentionally or not) when she becomes responsible for competing against IBM in an identical role for IBM's direct competitor, Microsoft.

### A.     The Risk of Disclosure of Trade Secrets Constitutes Irreparable Harm

Courts find irreparable harm when there is a risk that a former employer's trade secrets likely will inevitably be disclosed because "'the movant competes directly with the prospective employer and the transient employee possesses highly confidential or technical knowledge concerning . . . marketing strategies, or the like.'"  *Estee Lauder Cos. Inc.* v. *Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) (quoting *EarthWeb, Inc.* v. *Schlack*, 71 F. Supp. 2d 299, 309 (S.D.N.Y. 1999)).  The factors that guide courts in determining whether there is a risk of inevitable disclosure include:

> (1) the extent to which the new employer is a direct competitor of the former employer; (2) whether the employee's new position is nearly identical to [her] old one, such that [she] could not reasonably be expected to fulfill [her] new job responsibilities without utilizing the trade secrets of [her] former employer; (3) the extent to which the trade secrets at issue would be valuable to the new employer; and (4) the nature of the industry and its trade secrets.

*Papermaster*, 2008 WL 4974508, at *7 (quoting *Payment Alliance Intern., Inc.* v. *Ferreira*, 530 F. Supp. 2d 477, 482 (S.D.N.Y. 2007)).

The "inevitable disclosure" test is based not on the certainty of disclosure, but on the *risk* of disclosure, whether deliberate or not.  It does not require proof that the new employer actually misappropriated trade secrets or will for certain use the trade secret in the same way as the former employer.  As one court held:

> Of course, the nature of the subsequent employer's work is relevant to determining the risk of disclosure.  But I find no requirement in the New York decisions that the first employer's secrets be readily usable by the second employer.  <u>It is enough if the second employer's work is sufficiently similar to that of the first employer to make likely the risk of disclosure</u> by the employee in the course of his subsequent employment.

*Cont'l Grp., Inc.* v. *Kinsley*, 422 F. Supp. 838, 845 (D. Conn. 1976) (emphasis added).

Nor does the law require proof that the defecting employee intends to disclose trade secrets prior to issuance of an injunction.  As the court in *Papermaster* observed:

> [T]he Court has no evidence before it that Mr. Papermaster has disclosed any IBM trade secrets to date.  <u>The harm to IBM, however, is more likely to derive from inadvertent disclosure of the IBM trade secrets that have defined Mr. Papermaster's long career.</u> . . .  Thus, while the Court ascribes no ill-will to Mr. Papermaster, the Court finds that the likely inevitability of even inadvertent disclosure is sufficient to establish a real risk of irreparable harm to IBM.

2008 WL 4974508, at *10 (citations omitted and emphasis added).

Here, each of the *Papermaster* factors is met.  Given the breadth, depth, and duration of McIntyre's tenure at IBM and her high-ranking executive role and responsibilities, her knowledge of IBM's diversity strategies, initiatives, hiring targets, and representation data,

and her proposed competitive position at Microsoft, there is a "likely inevitability of even inadvertent disclosure" sufficient to establish a real risk of irreparable harm and sustain an injunction even if McIntyre had the best of intentions.

Indeed, Microsoft's own public statements prove that the four factors demonstrating a risk of inevitable disclosure exist here:

(1) IBM is a direct competitor (*see supra* pp. 5–6 & n.3);

(2) McIntyre intends to be in the same Chief Diversity Officer role at Microsoft that she held at IBM (*see* Gherson Decl. ¶ 17);

(3) The type of trade secrets McIntyre possesses—diversity data, strategies, initiatives, and methodologies—would be very valuable to a competitor: in Microsoft's words, "competitors could use [this information] in developing their own strategies" with respect to diversity (Microsoft December 2017 Brief, *supra* note 25, at 4) and that "competitors . . . may use the information in recruiting efforts against the company" (Microsoft April 2017 Brief, *supra* note 9, at 5); and

(4) Competitors in the IT industry safeguard their trade secrets and confidential information specifically with respect to data and strategies to recruit and retain diverse talent: "In the highly competitive tech industry where the same companies are competing for the same talent, the minority of which is female," it is "an especially acute concern" that confidential information regarding a company's diversity data, strategies and initiatives remain secret (Microsoft December 2017 Brief, *supra* note 25, at 5).

1.    *Microsoft Is a Direct Competitor of IBM, Including in the Development of Diversity Strategies, Initiatives, Technologies and Hiring Targets*

Microsoft competes directly against IBM not only in the sale of IT products and services to enterprise and government customers, but also, critically, with respect to the

development and implementation of diversity strategies and initiatives.  IBM and Microsoft also compete head-to-head to recruit and retain the top talent in the IT industry,[39] especially with respect to diverse talent.  Recent press articles discuss IBM's trend-setting diversity recruitment initiatives, and Microsoft's attempts to catch up to IBM in the competition for diverse talent.[40]

2.    *McIntyre's New Position Is Identical to Her Old One*

McIntyre is leaving her position as IBM's Chief Diversity Officer to become Microsoft's Chief Diversity Officer.  The risk that McIntyre may disclose or use the confidential IBM information she possesses at Microsoft (even if inadvertently) is not only likely but inevitable, because the position that Microsoft has offered her will place McIntyre at the helm of the same competitive initiatives and strategies at Microsoft that she devised, developed, implemented, and executed at IBM.  This is the very point Microsoft has been making to the court in the gender discrimination class action:  if competitors of IBM in the diversity labor market—which is what McIntyre proposes to be—have knowledge of IBM's confidential diversity data, strategies, and methods ("both what is working and what is not"), they will use that confidential information "in recruiting efforts" against IBM and "in developing their own strategies."  Microsoft April 2017 Brief, *supra* note 9, at 5; Microsoft January 2018 Brief, *supra* note 28, at 7.

---

[39]   *See* Microsoft Corp., Annual Report (Form 10-K) (July 28, 2016), https://www.sec.gov/Archives/edgar/data/789019/000119312516662209/d187868d10k.htm ("The market for highly skilled workers and leaders in our industry is extremely competitive.").

[40]   *See, e.g.*, Black Enterprise, *Intel and IBM Set the Diversity Example for Technology and for Us All* (Mar. 18, 2016), http://www.blackenterprise.com/intel-and-ibm-set-the-diversity-example-for-technology-and-for-us-all/ (explaining that "IBM was concerned with diversity in technology long before it became a much-discussed topic" and "other companies include Apple, Google, and Microsoft, which are also launching diversity initiatives and programs, especially ones that support young people of color in pursuing STEM careers.") The article also notes that "former IBM salesman and now Microsoft chairman John Thompson spoke recently about the support he received from IBM when he faced racism from clients as a salesman on the road."  *Id.*

It is not possible that McIntyre will be able to wall off within her own mind her knowledge of IBM's diversity strategies, initiatives, technologies, hiring targets, and representation data as she sets out to help Microsoft compete against IBM by developing and implementing Microsoft's diversity strategies and initiatives to improve Microsoft's diversity position. In her new role, McIntyre will be responsible for deciding how Microsoft can best compete against IBM—for the same business, the same customers, and the same diverse talent pool. McIntyre and Microsoft thus will have an opportunity to develop pre-emptive marketing strategies and diversity initiatives to blunt the competitive advantage of IBM's strategies.

      *3.*      *The Trade Secrets McIntyre Possesses Would Be Valuable to Microsoft*

Courts have held that a company's recruiting, retention, and talent pipeline development strategies are protectable trade secrets. *See, e.g.*, *Papermaster*, 2008 WL 4974508, at *3 ("Mr. Papermaster had access to confidential information concerning IBM's technical talent 'pipeline' . . . and technical recruitment strategies, all of which are part of IBM's corporate strategy development and are highly confidential."); *In re High-Tech Employee Antitrust Litig.*, No. 11-cv-02509, 2013 WL 163779, at *2, 5 (N.D. Cal. Jan. 15, 2013) (explaining that trade secrets include "sources of business information that might harm a litigant's competitive standing," including "confidential information regarding . . . recruitment strategies, policies, and procedures, [and] quantitative data concerning those topics").

As IBM's Chief Diversity Officer and Vice President, Leadership Succession Planning, McIntyre was responsible for and exposed to IBM's trade secrets and confidential information with respect to, among other things, the Company's non-secret, proprietary, and competitively sensitive diversity data, strategies, technologies, hiring targets, and initiatives. For example, McIntyre was responsible for: (a) monitoring and delivering presentations regarding confidential data about diverse representation in every segment of IBM's workforce; (b)

overseeing a confidential initiative to identify, target, and devise plans to recruit more than 50 top diverse external candidates for executive positions at the Company; (c) devising and implementing IBM's competitive and proprietary strategies to recruit and retain diverse talent and to develop IBM's existing talent pipeline for potential promotion within the Company; (d) influencing the design and overseeing the development and implementation of proprietary (and non-public) Artificial Intelligence-based software IBM uses internally to identify, track, and place the Company's most qualified diverse candidates into executive level positions; and (e) overseeing the development and implementation of IBM's proprietary methodologies for monitoring diversity metrics in its business units and incentivizing business managers to meet their diversity goals.

As just one example of how Microsoft  could use McIntyre's confidential and competitively sensitive information to IBM's detriment, the information McIntyre knows about the more than 50 diverse executive candidates IBM has identified for recruitment would reveal to Microsoft which candidates IBM is pursuing; where IBM is in the process of targeting, recruiting, interviewing, and placing those candidates; and what positions at the Company IBM is seeking to fill (or create) for those candidates.  Armed with that information, Microsoft could attempt to intercept some of those candidates from IBM, which could result in IBM losing the opportunity to hire such candidates, to the detriment of IBM.  As another example, the confidential information McIntyre knows as a result of her internally focused role to develop and place into executive positions IBM's existing diverse talent would inform Microsoft of some of the most important and valuable diverse talent at IBM that Microsoft could target for recruitment—again to IBM's competitive disadvantage.

Microsoft has conceded that the types of information McIntyre possesses are valuable to a competitor and would be harmful if disclosed, as demonstrated by its court filings in the *Moussouris* class action.  *See* Microsoft December 2017 Brief, *supra* note 25, at 4 (arguing that making Microsoft's diversity data, strategies and initiatives public "would give competitors direct, accurate information as to Microsoft's diversity and inclusion strategies . . . which competitors could use in developing their own strategies"); *see also* Microsoft April 2017 Brief, *supra* note 9, at 5 (arguing successfully that certain documents should remain sealed because "Microsoft's competitors could unjustly gain access to Microsoft's business strategies and initiatives related to diversity at Microsoft's expense and may use the information in recruiting efforts against the company"); *id.* at 2, 4 (arguing successfully that "documents that reflect Microsoft's diversity initiatives, strategy, and representation data for female employees at Microsoft" should remain sealed because they contain "confidential business information which, if disclosed, could cause competitive harm to Microsoft").

IBM has likewise guarded the confidentiality of its own diversity initiatives, strategies, and representation data—demonstrating its sensitivity and competitive value.  For example, on several occasions IBM has successfully opposed Freedom Of Information Act (FOIA) requests for the disclosure of this information on the basis of confidentiality, secrecy, and competitive harm.  (*See* Gherson Decl. ¶ 26.)  In 2012, a FOIA request was made for IBM's Equal Employment Opportunity Employer Information Reports ("EEO-1 reports") for the period covering 2004-2010.  IBM opposed the FOIA request, arguing that its EEO-1 reports contained confidential, commercially sensitive information covered by Exemption 4 of FOIA, 5 U.S.C. Section 552(b)(4), which protects ". . . trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential."  IBM explained in a letter to the

Office of Federal Contract Compliance Program (OFCCP) that disclosure of the requested information would cause substantial harm to the Company's competitive position.  After making an independent decision based on Exemption 4, the OFCCP agreed with IBM's position, denied the FOIA request, and stated:

> We believe that [IBM] made mandatory submissions to the government of information described as confidential proprietary trade secret information not released or otherwise made available to the public, or to competitors.  OFCCP believes that [IBM] provided well defined and reasoned objections to the release of its submitted information based upon business practices and experience. OFCCP has determined it will withhold [IBM's] EEO-1 Reports based upon FOIA Exemption 4 criteria.[41]

Importantly, at the same time IBM was safeguarding the confidentiality of its diversity initiatives, strategies, and representation data by opposing FOIA requests, so too was Microsoft.  In response to a 2012 CNN FOIA request, Microsoft, like IBM, argued to the OFCCP that its respective diversity data should be barred from disclosure because of the risk of competitive harm.[42]  This coupled with the *Moussouris* class action demonstrates Microsoft has fought inside and outside the courtroom to preserve the secrecy of the very information at issue in this case, precisely because of the substantial competitive harm that would result if it were disclosed.  IBM is in the same position.

---

[41]   *Id.  See also* Exhibit E to Complaint, OFCCP's Decision Rejecting CNN's FOIA Request dated Dec. 6, 2012. Subsequent FOIA requests for IBM's EEO-1 reports were made in 2013, 2015, 2016, and 2017, and each request resulted in the same outcome—the OFCCP's rejection of the FOIA request and refusal to disclose IBM's confidential information.  *See* Exhibits F–I to Complaint, OFCCP's Decision Rejecting Fortune's FOIA Request dated Apr. 24, 2017; OFCCP's Decision Rejecting Bloomberg's FOIA Request dated Nov. 3, 2016; OFCCP's Decision Rejecting Masterflight Foundation's FOIA Request dated Sept. 27, 2016; OFCCP's Decision Rejecting CNN Business News' FOIA Request dated July 22, 2013.

[42]   *See* Julianne Pepitone, *Black, female, and a Silicon Valley 'trade secret'*, CNN (Mar. 18, 2013), http://money.cnn.com/2013/03/17/technology/diversity-silicon-valley/index.html.

4.      *In the IT Industry, Diversity Strategies Are Closely Guarded Secrets Because Diversity Is a Competitive Advantage*

As acknowledged by Microsoft, having a diverse workforce is far more than a recruiting strategy, it is a business imperative.  IBM has made clear its view that a diverse workforce is critical to the quality, innovation, and competitive strength of its products and services, particularly against Microsoft.[43]  IBM measures its products, services, and diversity hiring initiatives against those offered by Microsoft, and reports publicly on instances when customers choose IBM over Microsoft.[44]  For its part, Microsoft has also publicly acknowledged that successful diversity and inclusion efforts are essential to a business's competitive success, stating that "diversity [and] inclusion is a business imperative for Microsoft" and "a diverse workforce brings a blend of perspectives and experiences that spark greater innovation, customer satisfaction, employee productivity, and corporate profitability."[45]  Furthermore, Microsoft concedes that diversity hiring is extremely competitive and high-stakes:  "Microsoft actively seeks to foster greater diversity in its workforce, and to recruit top diverse talent in a highly competitive labor market.  Otherwise, Microsoft could risk lack of key market representation; impact to innovation; lack of diverse talent pipeline, [and] high attrition and onboarding cost."[46]

---

[43]   *See, e.g.,* IBM, *For More Diversity in AI, a Look to the Next Generation* (Sept. 18, 2017), https://www.ibm.com/blogs/insights-on-business/ibmix/diversity-ai-look-next-generation/ (explaining IBM's view that a gender-imbalanced workforce limits the applications of the AI it develops because "AI reflects the human biases of its creators"); GeekWire, *IBM in the Cloud: Inside the Tech Giant's Quest to Stand Out Against Amazon, Microsoft, and Google* (Mar. 23, 2017), https://www.geekwire.com/2017/ibm-cloud-inside-tech-giants-quest-compete-amazon-microsoft-google/ (IBM "has a different view than others" on its AI approach"); Fortune, *Microsoft CEO Satya Nadella Has Much to Say About Artificial Intelligence* (Sept. 27, 2016), http://fortune.com/2016/09/26/microsoft-satya-nadella-artificial-intelligence/ ("'We are not pursuing A.I. to beat humans at games,' said Nadella, taking a subtle hit at competitors like Google and IBM . . . . Microsoft's overarching goal is to 'democratize A.I.'").

[44]   *See, e.g.,* IBM News Releases, *Workday taps IBM Cloud for development and testing* (Aug. 17, 2016), https://www.ibm.com/blogs/cloud-computing/2016/08/workday-softlayer-development-testing/ (promoting article noting that Workday, a company specializing in Human Resources software, selected IBM over Microsoft as its cloud services partner for a multi-year deal).

[45]   Microsoft April 2017 Brief, *supra* note 9, at 5.

[46]   *Id.*

Academic studies and industry commentary confirm that when companies succeed in competition for diverse talent, they are more likely to succeed in their competition for customers' business.[47]

Against this backdrop, there can be no serious question that the sensitive nature of the diversity information that McIntyre possesses is such that it would cause competitive harm to IBM if it fell into the hands of Microsoft.  As Microsoft explained, in arguing that it had demonstrated "compelling need" to keep its confidential information regarding its diversity data, strategies, and initiatives from getting into the hands of a competitor:

> Unsealing these materials would give competitors direct, accurate information as to Microsoft's diversity and inclusion strategies, and the results of those strategies (both what is working and what is not), which competitors could use in developing their own strategies.  In the highly competitive tech industry where the same companies are competing for the same talent, the minority of which is female, this is an especially acute concern.

Microsoft December 2017 Brief, *supra* note 25, at 4.

***

McIntyre's knowledge of IBM's confidential, competitively sensitive diversity-related data, strategies, technologies, hiring targets, and initiatives, together with the precise overlap between her old job at IBM and her new job at Microsoft, creates a risk of inevitable disclosure of trade secrets that amply satisfies the criteria for finding irreparable injury in a noncompete case under New York law.  *See, e.g.*, *Lumex, Inc.* v. *Highsmith*, 919 F. Supp. 624, 631 (E.D.N.Y. Mar. 19, 1966).  "'A trade secret once lost is, of course, lost forever' and, therefore, such a loss 'cannot be measured in money damages.'"  *Estee Lauder*, 430 F. Supp. 2d

---

[47]   *See supra* note 11 (compiling academic studies showing that a diverse workforce improves a company's financial performance and quoting Microsoft CEO Satya Nadella as saying that Microsoft "need[s] to recruit more diverse talent to Microsoft at all levels of the company" to meet the company's performance goals "in a world in which our customers are diverse and global").

at 174 (quoting *FMC Corp.* v. *Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984));
*accord Papermaster*, 2008 WL 4974508, at *7.

     Courts enforce noncompete agreements with respect to senior executives who,
like McIntyre, possess confidential strategic information about initiatives and plans in
development.  In *Estee Lauder*, 430 F. Supp. 2d at 182, for example, the court enjoined a product
marketing manager at Estee Lauder from working for a cosmetics rival on the basis that the
executive knew about his former employer's products in development.  The defecting employee
was responsible for developing marketing strategies, and had "a general idea of the plans for
launch of new products, including the marketing and geographic plans and the channels of
distribution for these products."  *Id.* at 163.  The court in *Estee Lauder* granted a preliminary
injunction based upon the risk of inevitable disclosure of branding and marketing trade secrets—
specifically, information about upcoming product launches.  *Id.* at 175–76, 179.[48]  Applying
comparable law to a noncompete agreement, the Delaware Court of Chancery enjoined an
executive vice president of Wal-Mart from becoming a division president at CVS Caremark.
Transcript of Argument and Ruling on Motion for Preliminary Injunction, *Wal-Mart Stores, Inc.*

---

[48] In *Payment Alliance*, the court issued a preliminary injunction to bar violation of a noncompetition agreement
by an executive who was knowledgeable about the marketing of a software application that his former employer
had launched.  530 F. Supp. 2d at 482, 485.  The court explained, "even if [the employee] acted with the best of
intentions, he may unintentionally transmit information gained through his association with [his former
employer] during his day to day contact with his new employer."  *Id.* at 482.

In *Lumex*, the court issued a preliminary injunction enjoining a former product manager for a manufacturer of
weightlifting equipment from going to work for a competitor.  919 F. Supp. at 636.  The court found that the
information the former employee was privy to by virtue of his position, which included information concerning
Lumex's market objectives, future target markets, and new product development, as well as a competitive
analysis of Lumex and the prospective employer's relative market positions, was "confidential and constituted
trade secrets" and that "the disclosure of these trade secrets and confidential information would seriously and
irreparably damage the future interests of Lumex."  *Id.* at 630.  The court also noted that the employee "was a
member of the elite strategic planning committee together with the top personnel of [his business unit] and
attended high level meetings in which future restructuring of [the business unit] was discussed, together with
detailed financial information, including costs and [] profit margins."  *Id.*

v. *Mullany*, No. 6040-VCL, 2010 WL 9036778 (Del. Ch. Dec. 15, 2010).  As the *Wal-Mart* court reasoned, "If noncompetes apply effectively anywhere, they apply to the senior, big dog, alpha male and female individuals <u>who are actually running the corporation, and have knowledge of its strategies and tactics and deepest secrets</u>."  *Id.* at 69–70 (emphasis added).

### B.  This Court Has Found Irreparable Harm Before Under IBM's Noncompetition Agreements

In *Papermaster*, this Court preliminarily enjoined another IBM employee from working for another competitor, Apple, based on the prospective violation of his noncompetition agreement.  *See* 2008 WL 4974508, at *7–9.  Although the ex-employee had not yet disclosed any confidential information to the rival, professed no intention to make such disclosure, and did not act in bad faith in any way, the Court found that "it is likely that Mr. Papermaster inevitably will draw upon his experience and expertise" at IBM.  *Id.* at *9 (citing *Lumex* for the proposition that risk of irreparable harm exists "where employee was a 'member of the elite strategic planning committee' and therefore 'privy to discussions' involving marketing strategy and product lines").

IBM is entitled to the same protection here.  McIntyre is knowledgeable about IBM's confidential information and trade secrets, including the same type of information regarding IBM's recruitment and retention strategies and its talent pipeline that was at issue in *Papermaster*.  Like Papermaster, McIntyre agreed that IBM would suffer irreparable harm if she violated her Noncompetition Agreement.  And like Papermaster, since McIntyre has been "inculcated" with IBM trade secrets concerning the company's plans in the highly competitive market for diverse talent, "it is no great leap for the Court to find that [IBM] has met its burden of showing a likelihood of irreparable harm."  *Id.* at *8.

Despite the similarities in this case to the facts of *Papermaster*, where the Court enforced the same IBM noncompetition agreement against an executive who intended to accept an identical position at a direct competitor, and notwithstanding Microsoft's arguments to the *Moussouris* court calling for the protection of its diversity-related data and information, McIntyre is likely to argue that this Court should instead seek guidance from *IBM* v. *Visentin*, No. 11 Civ 399 (LAP), 2011 WL 672025, at *1 (S.D.N.Y. Feb. 16, 2011). *Visentin* is inapposite. There, after a temporary restraining order had been entered and a full evidentiary hearing was held, the court declined to issue a preliminary injunction against an IBM executive who left IBM to work for HP. The *Visentin* court ruled that enforcement was not necessary in that case because the evidence presented at the preliminary injunction hearing did not establish that the executive was inculcated with IBM confidential information and trade secrets. The court found that the executive's primary job at IBM was to be a "general manager," and that, "[a]lthough trade secrets may have lurked somewhere on the periphery, the real thrust of his position was to manage his teams to make them as efficient as possible." *Id.* at *8. In light of these circumstances, the court ruled that IBM's Noncompetition Agreement was overbroad and unenforceable as against Visentin under the specific facts of his case—*i.e.*, where he was not bringing with him a wealth of directly relevant and competitive harmful trade secrets. Here, in contrast to *Visentin*, McIntyre is not just a "general manager," but was directly involved in the most senior executive strategy discussions and decisions in IBM, including with respect to recruitment and hiring strategies, diversity initiatives, executive development plans, and other trade secrets and proprietary information. Moreover, as the *Visentin* Court expressly noted, the ruling in that case was limited to the case at hand, and the reasonableness of a restrictive covenant is to be determined on a case-by-case basis: "Because the reasonableness of IBM's

36

Noncompetition Agreement *is determined on a case-by-case basis*, the Court does not and cannot address the validity of the Noncompetition Agreement under New York law generally." *Id.* at *22 n.7 (emphasis added).[49]

### C.      The Risk of Exploiting Customer Goodwill Constitutes Irreparable Harm

Courts also find irreparable harm where there is a risk that a former employee might exploit or expropriate the goodwill of client or customer relationships cultivated through the former employee's job responsibilities.  *See, e.g.*, *Global Switching Inc.* v. *Kasper*, No. CV 06 412(CPS), 2006 WL 1800001, at *13 (E.D.N.Y. Jun. 28, 2006) ("The loss of customer goodwill constitutes an irreparable injury."); *Johnson Controls, Inc.* v. *A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (finding that "[employee's] actions threaten to cause [employer] irreparable harm by luring away the business of a number of long-term [] clients" of employer).

McIntyre nurtured close personal relationships with major IBM customers in her twenty-year tenure at IBM.  (*See* Gherson Decl. ¶ 23.)  As Chief Diversity Officer of the Company, McIntyre attended numerous industry events as IBM's highest ranking customer goodwill representative, driving sales opportunities to all of IBM's business lines.  In addition to these industry events, McIntyre developed relationships with significant IBM customers and partners on the strength of IBM's goodwill, products, and services.  By moving to Microsoft, McIntyre threatens to exploit and/or expropriate the customer relationships she cultivated on IBM's time and with the benefit of IBM's resources, all to the detriment of IBM.  IBM thus is entitled to an injunction protecting the customer goodwill that McIntyre developed throughout

---

[49]     The *Visentin* Court also specifically credited efforts that HP had taken to minimize the overlap of responsibilities in and geographic scope of the executive's prior role.  *Id.* at *4–5, *18–19.  Microsoft has made no such efforts here:  it intends to make McIntyre, who was IBM's Chief Diversity Officer, the Chief Diversity Officer of Microsoft.

her career at IBM.  *See, e.g.*, *BDO Seidman* v. *Hirshberg*, 93 N.Y.2d 382, 392 (N.Y. 1999) ("The employer has a legitimate interest in preventing former employees from exploiting or expropriating the goodwill of a client or customer, which has been created and maintained at the employer's expense, to the employer's competitive detriment.").

###### D.   McIntyre Stipulated That a Violation of Her Noncompetition Agreement Would Irreparably Harm IBM

In determining whether a threat of irreparable harm exists, "the existence of the Noncompetition Agreement is highly relevant."  *Papermaster*, 2008 WL 4974508, at *7. McIntyre agreed that disclosing the IBM confidential information she possesses to a competitor would cause irreparable injury to IBM, and that an injunction is the appropriate remedy for that threat.  (*See* Noncompetition Agreement §§ 1(b), 3, 5.)  Indeed, McIntyre expressly consented to an injunction in the event of breach:  "you further consent and stipulate to the entry of such injunctive relief in such a court prohibiting you from breaching this Agreement."  (*Id.* § 5)

According to the Second Circuit, contractual provisions that acknowledge such harm "might arguably be viewed as an admission by [the defendant] that plaintiff will suffer irreparable harm were [s]he to breach the contract's non-compete provision."  *Ticor Title Ins. Co.* v. *Cohen*, 173 F.3d 63, 69 (2d Cir. 1999); *cf. N. Atl. Instruments, Inc.* v. *Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (relying on similar clause in confidentiality agreement in finding irreparable injury to support injunctive relief).  In *Papermaster*, the court relied on the same acknowledgments made by McIntyre in her IBM Noncompetition Agreement—*i.e.*, "that IBM would suffer 'irreparable harm' if she violated" her obligations—finding that this "'explicit provision in the agreement' and 'common sense' indicate that IBM will be irreparably harmed by the disclosure of the important technical and proprietary information that Mr. Papermaster

carries in his head."  2008 WL 4974508, at *9 (quoting *Global Telesys., Inc.* v.  *KPNQwest*, 151 F. Supp. 2d 478, 482 (S.D.N.Y. 2001)).[50]

## II.      IBM IS LIKELY TO PREVAIL ON THE MERITS

IBM is likely to prevail on its claims for breach of contract and misappropriation of trade secrets.  The same facts that support a finding of irreparable harm in the absence of a preliminary injunction also demonstrate IBM's likelihood of success on the merits.  "'In non-compete cases, such as this one, the irreparable harm analysis and the likelihood of success on the merits analysis are closely related and often conflated.'"  *Papermaster*, 2008 WL 4974508, at *6 (quoting *Int'l Creative Mgmt., Inc.* v. *Abate*, No. 07-CV-1979 (PKL), 2007 WL 950092, at *2 (S.D.N.Y. Mar. 28, 2007)).

As a senior IBM executive, McIntyre signed the Noncompetition Agreement, in which she acknowledged and agreed that she would be "exposed to some of the most sensitive and confidential information possessed by IBM" and in which she conceded that IBM would suffer "irreparable harm" if she were to disclose those secrets or breach her noncompetition obligations.  (Noncompetition Agreement §§ 1(a), 1(b), 3.)  McIntyre agreed to wait for one year before going to work for a competitor in a role that competes with the IBM business unit for which she worked most recently at IBM.  (*Id.* at § 1(c).)

McIntyre's proposed employment at Microsoft squarely violates the Noncompetition Agreement.  Microsoft competes directly with IBM across their IT product and services businesses and also competes head-to-head with IBM to recruit and retain the top talent in the IT industry, especially with respect to diverse talent—the very activity that McIntyre was

---

[50]    *Accord Ticor Title*, 173 F.3d at 68–69; *Ayco Co., L.P.* v. *Feldman*, No. 1:10-CV-1213 (GLS/DRH), 2010 WL 4286154, at *8 (N.D.N.Y. Oct. 22, 2010); *IDG USA, LLC* v. *Schupp*, No. 10-CV-76S, 2010 WL 3260046, at *9 (W.D.N.Y. Aug. 18, 2010), *aff'd in part, vacated in part and remanded on other grounds by* 416 F. App'x 86 (2d Cir. 2011); *Estee Lauder*, 430 F. Supp. 2d at 174; *Ikon Office Solutions, Inc.* v. *Usherwood Office Tech., Inc.*, No. 9202–08, 2008 WL 5206291, at *17 (N.Y. Sup. Ct. Dec. 12, 2008).

responsible for in her recent role as Chief Diversity Officer of IBM.  (*See* Gherson Decl. ¶ 29.)

The role Microsoft proposes for McIntyre will make her responsible for the same strategies and

initiatives at Microsoft, as Microsoft continues its efforts to compete directly against IBM in the

recruitment of diverse talent.  And McIntyre intends to start working for Microsoft right away,

without honoring the one-year restrictive period in her Noncompetition Agreement.

### A.      IBM Has a Legitimate Interest in Safeguarding Its Confidential Information

An employer has a "legitimate interest" in "safeguarding that which has made his

business successful and to protect himself against deliberate surreptitious commercial piracy."

*Estee Lauder*, 430 F. Supp. 2d at 177 (quoting *Reed, Roberts Assocs., Inc.* v. *Strauman*,

353 N.E.2d 590, 593 (N.Y. 1976)); *see also BDO Seidman*, 93 N.Y.2d at 391 (explaining that an

employer has a "legitimate interest" in preventing the "competitive use, for a time, of

*information* or *relationships* which pertain peculiarly to the employer and which the *employee*

*acquired* in the course of the employment" (emphasis in original)).  Therefore, "restrictive

covenants will be enforceable to the extent necessary to prevent the disclosure or use of trade

secrets or confidential customer information."  *Estee Lauder,* 430 F. Supp. 2d at 177 (quoting

*Reed, Roberts*, 353 N.E.2d at 593).

The confidential business information that McIntyre knows constitutes protectable

trade secrets under New York law, which considers a trade secret "'any formula, pattern, device

or compilation of information which is used in one's business, and which gives [the owner of

such secrets] an opportunity to obtain an advantage over competitors who do not know or use

it.'"  *Softel, Inc.* v. *Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997)

(quoting Restatement of Torts § 757 cmt. b); *see also Papermaster*, 2008 WL 4974508, at *8

(noting Papermaster's knowledge of "strategic plans, product development, technical recruitment, and long-term business opportunities for IBM").[51]

New York cases confirm that IBM has a "legitimate interest" in protecting the types of confidential business and marketing information and strategies McIntyre acquired at IBM. *See, e.g.*, *Papermaster*, 2008 WL 4974508, at *8 (knowledge of "confidential information concerning IBM's technical talent 'pipeline' [and] technical recruitment strategies" which is "sensitive and confidential information . . . that is disclosed to a select few within the company"); *Lumex*, 919 F. Supp. at 629–31 (knowledge of confidential strategic plans and the former employer's competitive analysis of the new employer); *DoubleClick, Inc.* v. *Henderson*, No. 116914/97, 1997 WL 731413, at *4–5 (N.Y. Sup. Ct. Nov. 7, 1997) (knowledge of confidential revenue projections, future plans, and pricing and product strategies).

Nor can Microsoft—given the position it took to successfully obtain a sealing order in the *Moussouris* case—be heard to argue otherwise. *See* Order Granting Motion to Seal, *supra* note 32 (order filed under seal, granting Microsoft's request to seal information relating to "Microsoft's diversity initiatives, strategy, and representation data for female employees at Microsoft" and "Microsoft's public relations and communications strategies, . . . internal business operations and internal discussion regarding the company's competitors"); *see also* Microsoft December 2017 Brief, *supra* note 25, at 4–5 (arguing that "compelling reasons" existed to prevent competitors from obtaining Microsoft's valuable confidential information

---

[51]   New York courts consider the following factors in determining whether information constitutes a trade secret: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *N. Atl. Instruments*, 188 F.3d at 44 (quoting *Ashland Mgmt. Inc.* v. *Janien*, 624 N.E.2d 1007, 1013 (N.Y. 1993)).  A review of each factor confirms that McIntyre's knowledge of IBM's diversity initiatives, strategy and data constitutes protected trade secret material.

regarding its diversity data, strategies and initiatives).  Other courts have also granted motions to seal employment-related information that could impact recruiting.  *See, e.g.*, *In re High-Tech*, 2013 WL 163779, at *4 (N.D. Cal. Jan. 15, 2013) (finding good cause to seal documents containing "compensation and recruiting strategies, policies, and procedures, including quantitative data," where public disclosure could cause harm "by giving third-parties . . . insights into confidential and sensitive aspects of each of the Defendants' strategies, competitive positions, and business operations, allowing these third-parties to potentially gain an unfair advantage in dealings with and against each of the Defendants").

### B.      The Limitations on McIntyre's Post-IBM Employment Are Reasonable

Under New York law, "there are no *per se* lines demarcating what constitutes an unreasonable durational or geographic scope" in a noncompetition agreement.  *See Estee Lauder*, 430 F. Supp. 2d at 180.  The "durational reasonableness of a non-compete agreement is judged by the length of time for which the employer's confidential information will be competitively valuable."  *Id*.  In the *Papermaster* case, the court found that the same one-year prohibition on competition and customer solicitation that McIntyre agreed to was "very limited in time."  2008 WL 4974508, at *11 (quoting *Natsource LLC* v. *Paribello*, 151 F. Supp. 2d 465, 471–72 (S.D.N.Y. 2001)).  The court also found that IBM had established, in that case, that "the trade secrets that [Papermaster] has been exposed to during his long tenure at IBM are likely to remain competitively valuable to IBM and its competitors for more than a year."  *Id*.  Other courts applying New York law have upheld two- and three-year noncompete periods.  *See, e.g.*, *Payment Alliance*, 530 F. Supp. 2d at 485; *Battenkill Veterinary Equine P.C.* v. *Cangelosi*, 768 N.Y.S.2d 504, 506–07 (N.Y. App. Div. 3d Dep't 2003); *Alside Div. of Associated Materials Inc.* v. *Leclair*, 743 N.Y.S.2d 898, 898–99 (N.Y. App. Div. 3d Dep't 2002).

The overlap between McIntyre's position and responsibilities at IBM and her proposed position and responsibilities at Microsoft also makes enforcement reasonable.  The business secrets and confidential information McIntyre has in her possession will be valuable to Microsoft, and thus detrimental to IBM, for at least a year.  Indeed, Microsoft's own conduct proves this point: in *Moussouris*, it argued that if certain information was disclosed—the same type of information that McIntyre possesses here—then "Microsoft's competitors could unjustly gain access to Microsoft's business strategies and initiatives related to diversity at Microsoft's expense and may use the information in recruiting efforts against the Company."  Microsoft April 2017 Brief, *supra* note 9, at 5; *see also* Microsoft December 2017 Brief, *supra* note 25, at 4 (releasing information regarding Microsoft's diversity data, initiative and strategies "would give competitors direct, accurate information as to Microsoft's diversity and inclusion strategies, and the results of those strategies (both what is working and what is not), which competitors could use in developing their own strategies").  Notably, Microsoft moved to seal its diversity data, strategies and initiatives in that case even though, in some instances, this information was over a year old.  *See, e.g.,* Microsoft's July 2017 Brief, *supra* note 20 (moving to seal content related to Microsoft's announcement of its April 2016 Equal Pay Study).  Like Microsoft, IBM has steadfastly and successfully safe-guarded its own diversity initiatives, strategies, and representation data going back several years.  Indeed, IBM and Microsoft each successfully opposed the same FOIA requests seeking disclosure of confidential information regarding their diversity initiatives and strategies.  *See, e.g.*, Exhibit K to Complaint, OFCCP FOIA Response (May 1, 2015); *see also* Pepitone, *supra* note 42.

The geographical scope of McIntyre's restriction is worldwide, which, too, is reasonable because IBM and Microsoft compete globally and McIntyre's job responsibilities (at

IBM and Microsoft) are global.  In *Papermaster*, the court found that "the nature of IBM's business 'requires that the restriction be unlimited in geographic scope.'"  2008 WL 4974508, at *11 (quoting *Natsource*, 151 F. Supp. 2d at 471–72).  Other courts have also upheld worldwide limits on post-employment competition.  *See, e.g.*, *Estee Lauder*, 430 F. Supp. 2d at 181; *Bus. Intelligence Servs., Inc.* v. *Hudson*, 580 F. Supp. 1068, 1073 (S.D.N.Y. 1984).

Finally, McIntyre's skills and experience as an executive in the Human Resources department of a Fortune 100 company, and as IBM's Chief Diversity Officer for the past two and a half years, make her marketable for a high ranking executive position at any number of companies, including companies that do not compete directly against IBM—indeed, McIntyre stated to IBM that she had considered, but rejected, an opportunity at a company in the food services industry.  (*See* Gherson Decl. ¶ 33.)  The Noncompetition Agreement McIntyre entered into with IBM would not prevent her from working as the Chief Diversity Officer for such companies.  Accordingly, that restriction is reasonable under applicable law, and should be enforced.

## III.   IN THE ALTERNATIVE, SUFFICIENTLY SERIOUS QUESTIONS GO TO THE MERITS AND THE BALANCE OF THE EQUITIES WEIGHS IN IBM'S FAVOR

Even if this Court were not satisfied that IBM is likely to prevail on the merits, IBM has raised sufficiently serious questions going to the merits of the dispute and shown that the balance of the equities weighs in its favor to warrant the issuance of a preliminary injunction. In balancing the equities, a court "must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood." *Natsource*, 151 F. Supp. 2d at 470 (quoting *Ticor Title*, 173 F.3d at 69).

Here, the balance of equities tips decidedly in IBM's favor.  McIntyre *agreed* to wait a year before working for one of IBM's competitors, and she did so in exchange for career

44

opportunities and equity compensation at IBM.  (*See* Noncompetition Agreement ¶ 1, § 1(c).)
After benefiting from those opportunities and that compensation, she left IBM voluntarily.
McIntyre chose to start a new phase of her career at a company that competes against IBM for
the very same business, revenue, and future growth.  There is no inequity in compelling
McIntyre to honor her contractual undertaking to wait before beginning that job, and certainly no
inequity in delaying her employment by Microsoft while the Court considers IBM's motion for a
preliminary injunction.  This is particularly so where McIntyre's skills can be applied in Chief
Diversity Officer positions for companies that do not directly compete against IBM, and such
positions are readily available to her.

In contrast, IBM faces immediate and irremediable damage, including the
disclosure of highly confidential and proprietary information, and loss of substantial business,
should Microsoft gain access to the knowledge McIntyre has about IBM's confidential plans and
strategies.  In *Papermaster,* the court found that the balance of equities favored IBM because
"IBM's need to protect its legitimate business interests substantially outweighs the harm
resulting to Mr. Papermaster from temporarily not working for Apple."  *Papermaster*, 2008 WL
4974508, at *13.  Similarly, any prejudice to McIntyre is substantially outweighed by the
prejudice IBM would suffer absent injunctive relief.

## IV.   A TEMPORARY RESTRAINING ORDER SHOULD BE ISSUED AND AN EXPEDITED SCHEDULE FOR THE MOTION SHOULD BE SET

The immediacy of McIntyre's intended employment at Microsoft justifies a
temporary restraining order.  *See* Fed. R. Civ. P. 65(b).  McIntyre intends to compete against
IBM by becoming Microsoft's Chief Diversity Officer and the face of Microsoft to its customers
and prospective customers as early as February 13, 2018.  Unless enjoined, McIntyre will
become a Microsoft executive soon, creating a real risk that "immediate and irreparable injury,

loss, or damage will result to the movant before the adverse party can be heard in opposition."

*Id.*

## CONCLUSION

For the foregoing reasons, IBM respectfully submits that this Court should enter a temporary restraining order and a preliminary injunction prohibiting defendant Lindsay Rae McIntyre from commencing employment at Microsoft prior to January 29, 2019, in accordance with the Noncompetition Agreement.

Dated: New York, New York
February 11, 2018

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____
Robert A. Atkins
Liza M. Velazquez
Pietro J. Signoracci

1285 Avenue of the Americas
New York, New York  10019-6064
(212) 373-3000
ratkins@paulweiss.com
lvelazquez@paulweiss.com
psignoracci@paulweiss.com

*Attorneys for Plaintiff*
*International Business Machines Corporation*