UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

Plaintiff,

v.

LINDSAY-RAE MCINTYRE,

Defendant.

---

Case No. 18-cv-1210-VB

# DEFENDANT'S MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFF'S MOTION FOR A
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Michael Delikat
James H. McQuade
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
(212) 506-5000

Sarah E. Bouchard
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5000

Attorneys for Defendant Lindsay-Rae McIntyre

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................ 6

ARGUMENT ................................................................................................ 6

I.     IBM HAS FAILED TO DEMONSTRATE IRREPARABLE HARM ............................ 7

     A.    There Has Been No Actual Misappropriation ...................................................... 7

     B.    IBM Cannot Salvage Its Motion by Resorting to the "Inevitable Disclosure" Doctrine ................................................................................................ 8

     C.    IBM Cannot Discharge Its Burden by Relying on the Terms of the Agreement ................................................................................................ 13

II.    PLAINTIFF CANNOT ESTABLISH A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS ................................................................................................ 14

     A.    The Agreements Are Unenforceable Under New York Law ............................... 14

          1.    IBM Cannot Demonstrate, by Clear and Convincing Evidence, That Enforcement Is Necessary to Protect a Legitimate Interest ............ 17

          2.    The Scope of the Agreements Is Overly Broad and Unreasonable ......... 22

     B.    IBM Cannot Establish an Entitlement to Partial Enforcement ............................ 23

III.   THE BALANCE OF EQUITIES DOES NOT FAVOR IBM ......................................... 24

CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allways Elec. Corp. v. Abrams*,
    902 N.Y.S.2d 670 (2d Dep't 2010) ................................................................. 23

*Am. Airlines, Inc. v. Imhof*,
    620 F. Supp. 2d 574 (S.D.N.Y. 2009) ........................................................ 8, 12

*Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.*,
    682 F.2d 382 (2d Cir. 1982) ......................................................................... 17

*AM Medica Commc'ns Gp. v. Kilgallen*,
    261 F. Supp. 2d 258 (S.D.N.Y. 2003) ........................................................... 16

*Andino v. Fischer*,
    555 F. Supp. 2d 418 (S.D.N.Y. 2008) ............................................................. 7

*Anwar v. Fairfield Greenwich Ltd.*,
    728 F. Supp. 2d 462 (S.D.N.Y. 2010) ............................................................. 6

*Ashland Mgmt., Inc. v. Janien*,
    82 N.Y.2d 395 (1993) .................................................................................... 18

*Baker's Aid v. Hussmann Foodservice Co.*,
    830 F.2d 13 (2d Cir. 1987) ............................................................................ 13

*Bell & Howell v. Masel Supply Co.*,
    719 F.2d 42 (2d Cir. 1983) .............................................................................. 7

*Boston Laser, Inc. v. Qinxin Zu*,
    No. CIV.A. 3:07-CV-0791, 2007 WL 2973663 (N.D.N.Y. Sept. 21, 2007),
    *report and recommendation adopted*, 2007 WL 2973590 (N.D.N.Y. Oct. 9,
    2007) ............................................................................................................... 8

*DAG Jewish Directories, Inc. v. Y & R Media, LLC*,
    No. 09 CIV. 7802, 2010 WL 46016 (S.D.N.Y. Jan. 7, 2010) .......................... 6

*Doninger v. Niehoff*,
    527 F.3d 41 (2d Cir. 2008) ......................................................................... 6, 24

*Donohue v. Paterson*,
    715 F. Supp. 2d 306 (N.D.N.Y. 2010) ........................................................... 14

*EarthWeb, Inc. v. Schlack,*
   71 F. Supp. 2d 299 (S.D.N.Y. 1999), *aff'd*, 2000 WL 1093320 (2d Cir. May
   18, 2000) ................................................................................................ *passim*

*Ellison Sys., Inc. v. Ayala,*
   No. 0600500/2007, 2008 WL 2625144 (N.Y. Sup. Ct. N.Y. Cty. June 24,
   2008) ................................................................................................... 17, 22

*Faiveley Transport Malmo AB v. Wabtec Corp.,*
   559 F.3d 110 (2d Cir. 2009) .............................................................................. 14

*Freedom Holdings, Inc. v. Spitzer,*
   408 F.3d 112 (2d Cir. 2005) ................................................................................ 7

*Heyman v. Ar. Winarick, Inc.,*
   166 F. Supp. 880 (S.D.N.Y. 1958) ................................................................. 7, 14

*Indotronix Int'l Corp. v. Ayyala,*
   888 N.Y.S.2d 170 (2d Dep't 2009) ....................................................................... 8

*Int'l Bus. Machs. Corp. v. Johnson,*
   629 F. Supp. 2d 321 (S.D.N.Y. 2009), *aff'd*, 355 F. App'x 454 (2d Cir. 2009) ............. *passim*

*Int'l Bus. Machs. Corp. v. Papermaster,*
   No. 08-CV-9078 (KMK), 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008) ........................ 12, 15

*Int'l Bus. Machs. Corp. v. Visentin,*
   No. 11 CIV. 399 LAP, 2011 WL 672025 (S.D.N.Y. Feb. 16, 2011), *aff'd*, 437
   F. App'x 53 (2d Cir. 2011) .......................................................................... *passim*

*Lehman v. Dow Jones & Co.,*
   783 F.2d 285 (2d Cir. 1986) .............................................................................. 18

*Litwin v. OceanFreight, Inc.,*
   865 F. Supp. 2d 385 (S.D.N.Y. 2011) ................................................................... 6

*Marietta Corp. v. Fairhurst,*
   754 N.Y.S.2d 62 (3d Dep't 2003) .................................................................... 8, 19

*Metito (Overseas) Ltd. v. Gen. Elec. Co.,*
   No. 05 CIV. 9478(GEL), 2009 WL 399221 (S.D.N.Y. Feb. 18, 2009) ............................ 12

*Newco Waste Sys. v. Swartzenberg,*
   510 N.Y.S.2d 399 (4th Dep't 1986) ..................................................................... 22

*Pella Windows & Doors v. Buscarnera,*
   No. 07 CV 82, 2007 WL 2089298 (E.D.N.Y. July 18, 2007) ..................................... 17

*Price Paper and Twine Co. v. Miller,*
   582 N.Y.S.2d 746 (2d Dep't 1992)......................................................................17

*Salinger v. Colting,*
   607 F.3d 68 (2d Cir. 2010)..............................................................................13

*Scott, Stackrow and Co., C.P.A.'s, P.C. v. Skavina,*
   780 N.Y.S.2d 675 (3d Dep't 2004).....................................................................23

*SG Cowen Sec. Corp. v. Messih,*
   224 F.3d 79 (2d Cir. 2000)......................................................................7, 14, 22

*Silipos, Inc. v. Bickel,*
   No. 1:06-cv-02205, 2006 WL 2265055 (S.D.N.Y. Aug. 8, 2006) .........................19

*sit-up Ltd. v. IAC/InterActive Corp.,*
   No. 05-CV-9292 (DLC), 2008 WL 463884 (S.D.N.Y. Feb. 20, 2008) ...................18

*Spinal Dimensions, Inc. v. Chepenuk,*
   No. 4805-07, 2007 WL 2296503 (N.Y. Sup. Ct. Albany Cty. Aug. 9, 2007) .........11

## Other Authorities

Equal Employment Opportunity Comm'n, *Diversity in High Tech,*
   https://www.eeoc.gov/eeoc/statistics/reports/hightech/.........................................25

Defendant Lindsay-Rae McIntyre ("McIntyre"), by and through her attorneys, Orrick, Herrington & Sutcliffe LLP and Morgan, Lewis & Bockius LLP, respectfully submits this Memorandum of Law in Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (the "Motion").[1]

## PRELIMINARY STATEMENT

Plaintiff International Business Machines Corporation ("IBM") wrongly seeks to enjoin Lindsay-Rae McIntyre, an HR leader with no technical training, from becoming Microsoft Corporation's ("Microsoft") Chief Diversity Officer. McIntyre took no confidential information, reaffirmed her non-disclosure obligations, and accepted a role in a discipline where technology companies seek public accolades and are transparent about their efforts. In this context, IBM's efforts to enforce an overbroad non-competition clause is unwarranted and this motion for injunctive relief should be denied.

Workplace diversity and inclusion is a critical issue facing the entire technology industry. While it is true that organizations that do better on diversity and inclusion may have a competitive advantage, that simple construct should not be confused with the issue before this Court: whether IBM can enforce a breathtakingly overbroad non-competition agreement against its former chief diversity officer who has taken no IBM confidential information and has reaffirmed her obligations to maintain the confidentiality of any IBM confidential information she may recall from working in her prior role.

In recent years, virtually every technology company has been investing heavily—and very publicly—in diversity and inclusion. This includes efforts to increase the STEM pipeline for women and minorities, design corporate diversity and inclusion programs and initiatives, and

---

[1] This brief and supporting declarations were prepared before McIntyre was served with Plaintiff's moving papers. Accordingly, McIntyre reserves the right to submit supplemental opposition papers.

foster accountability for measurable progress.  But the issue of diversity and inclusion for the technology industry is larger than any one company.  Companies, including IBM and Microsoft, recognize the importance of strong collaboration with peer companies and other stakeholders to create enduring progress.  Ultimately, diversity and inclusion is about increasing opportunities for more people to succeed and thrive, and to incorporate the contributions of a wider range of perspectives to maximize success.

Importantly, the level and detail of voluntary public disclosure of information relating to the success of corporate diversity and inclusion efforts is fundamentally different than other aspects of business in the technology industry.  IBM's own diversity and inclusion efforts over the years exemplifies this.  Since the mid-1990s, IBM has been vocal and open about its diversity efforts and has affirmatively sought to publicize them and win awards recognizing those efforts.  Top IBM executives, including IBM's current CEO, Ginni Rometty, and previous CEOs, speak publicly on a regular basis about IBM's commitment to diversity and inclusion.  For more than two decades, they have shared their approach to key diversity initiatives, diversity demographics, and ideas on how to leverage technology to advance various human resources priorities, including diversity.  IBM's openness and transparency about its work in the diversity space has garnered public recognition from industry groups.

Lindsay-Rae McIntyre had a successful career at IBM, holding a variety of human resources positions.  Over the past three years, she has (among other responsibilities) led IBM's diversity and inclusion programs.  In January 2018, McIntyre informed IBM she had accepted a position with Microsoft as its new Chief Diversity Officer and planned to move from New York to Washington.  IBM thereafter terminated her employment.

McIntyre—a mother of three young children and the primary wage earner in her household—was thrilled to land this role, as it would both allow her to continue to advance her career and meet her personal and family needs. Indeed, McIntyre sought and accepted the Microsoft role in part because it would allow her and her family to relocate from New York to Redmond, Washington, just a few hours' drive from her parents and other extended family.

However, one unexpected obstacle remains. IBM surprisingly seeks a draconian temporary restraining order and preliminary injunction to prevent McIntyre from working—for an entire year, in any position, anywhere in the world—for any company IBM deems to be a "competitor" in any dimension. Rather than recognizing her past contributions and sending her off to continue her great work improving diversity and inclusion in the technology industry, IBM seeks to block McIntyre's professional mobility—and thereby mitigate her career opportunities—despite the fact that her new role involves no credible or legitimate protectable interest that would be at risk. Indeed, IBM is taking the position that even placing McIntyre on Microsoft's payroll without allowing her to engage in any substantive work or have access to Microsoft systems would violate McIntyre's non-competition obligations.

No one disputes that technology companies have confidential information that must be protected. McIntyre has not provided IBM with any reason to doubt her credibility, her respect for her own IBM legacy, or her promise to abide by her obligations to protect IBM's confidential information and abide by her other post-employment restrictions. IBM's aggressive, adversarial approach, which it also has taken against other employees who have good reason to leave, does a disservice not only to McIntyre, but also to all employees who make personal choices to take on new challenges while agreeing to honor their commitments with respect to non-disclosure of confidential information and non-solicitation of IBM employees and customers.

IBM's Motion should be denied for several reasons.  First, IBM cannot demonstrate irreparable harm because there is no evidence that McIntyre has misappropriated, or will misappropriate, any IBM confidential or proprietary information, and IBM is fully protected by an ongoing non-disclosure agreement.

Second, IBM cannot identify any legitimate protectable interest that would justify enforcing the Noncompetition Agreement to prevent McIntyre from working at Microsoft.  Any claim from IBM that it seeks to protect "trade secrets" through this action is simply an excuse to shield its true motivation of preventing its talent from leaving IBM to work elsewhere.  IBM cannot credibly identify any information that requires protection under these circumstances, and IBM already publicly discloses a vast amount of information regarding its diversity program and diversity statistics in order to establish itself as a leading company with respect to diversity efforts.  To the extent there is confidential information that McIntyre had access to while employed at IBM, like the achievements of diversity goals in certain lines of IBM businesses, McIntyre no longer has that information and it is not committed to her memory.  Moreover, Microsoft will have no use for IBM's diversity data or any non-public information about diversity programs at IBM because Microsoft needs diversity programs that work for its specific culture, not IBM's.

Third, the balance of the equities clearly favors McIntyre.  If the requested relief were granted, McIntyre would be deprived of her right to work at Microsoft or in the industry as a whole for one year, causing a devastating impact on her family and career.  In addition, IBM's position is misguided given the strong public policy in favor of diversity and inclusion efforts.

The IBM non-competition agreement in this case has been subject to judicial scrutiny in this Circuit on multiple occasions.  The Second Circuit affirmed two decisions of this Court—

*International Business Machines Corporation v. Visentin*, No. 11 CIV. 399 LAP, 2011 WL 672025 (S.D.N.Y. Feb. 16, 2011), *aff'd*, 437 F. App'x 53 (2d Cir. 2011) and *International Business Machines Corporation v. Johnson*, 629 F. Supp. 2d 321 (S.D.N.Y. 2009), *aff'd*, 355 F. App'x 454 (2d Cir. 2009)—rejecting IBM's attempt to enforce the virtually identical broad non-competition provision at-issue here.   In *Visentin*, the Court denied IBM's motion for a preliminary injunction against the company's former General Manager of IBM's Integrated Technology Services business segment to restrain him from joining a competitor.   2011 WL 672025, at *1-5.  The Court held that IBM did not meet its burden of demonstrating the existence of any trade secret or confidential information in need of protection.  *Id.* at *16.  In addition, the Court was not persuaded that the nature of defendant's new position would require him to use or disclose IBM's confidential information, especially given the non-disclosure agreement in place. *Id.* at *20.  The Court also found that the IBM non-competition agreement was overbroad and imposed an undue hardship on defendant.  *Id.* at *21-23.

Similarly, in *Johnson*, this Court rebuffed IBM's request to enjoin its former Vice President of Corporate Development from assuming a role with a competitor.  629 F. Supp. 2d at 323-24.  Even though defendant possessed "inside strategic business information about IBM," the Court found that the former employee "d[id] not have the sort of information that is considered quintessential trade secret information—detailed technical know-how, formulae, designs or procedures."  *Id.* at 335.  Moreover, preventing defendant from working in his chosen field for a year "would cause him not insubstantial harm," given the need to stay current on developments in the technology industry.  *Id.* at 336.  This case presents far more compelling circumstances for non-enforcement of this overbroad non-competition agreement than either *Visentin* or *Johnson*.

In sum, McIntyre is already subject to a variety of post-employment restrictions that she has reaffirmed:  non-disclosure or use of any IBM confidential information and non-solicitation of IBM employees or customers.  IBM, therefore, is fully protected.  But IBM yet again seeks to enforce a breathtakingly overbroad non-competition agreement for the improper reason of preventing talent from walking out the door.  The controlling law of this circuit makes clear that IBM is not entitled to relief under these circumstances.  Therefore, McIntyre respectfully submits that IBM's Motion must be denied.

## FACTUAL BACKGROUND

The facts are set forth in full in the accompanying Declaration of Lindsay-Rae McIntyre, dated February 11, 2018 ("McIntyre Decl."), Declaration of Samuel Estreicher, dated February 7, 2018 ("Estreicher Decl."), and Declaration of Joseph Whittinghill, dated February 11, 2018 ("Whittinghill Decl."), to which the Court is respectfully referred as if set forth in full herein.

## ARGUMENT

Temporary restraining orders and preliminary injunctions are among "the most drastic tools in the arsenal of judicial remedies" and must be used with caution.  *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 462, 472 (S.D.N.Y. 2010).  Indeed, temporary restraining orders and preliminary injunctions are "extraordinary remed[ies] never awarded as of right." *Litwin v. OceanFreight, Inc.*, 865 F. Supp. 2d 385, 391 (S.D.N.Y. 2011); *DAG Jewish Directories, Inc. v. Y & R Media, LLC*, No. 09 CIV. 7802, 2010 WL 46016, at *1 (S.D.N.Y. Jan. 7, 2010).

Such relief will be granted only if the movant establishes, with competent evidence, each of the following essential elements: (1) irreparable harm; and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balancing of equities in its favor.  *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008).  The standard for an entry of a

temporary restraining order is the same as for a preliminary injunction. *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) ("It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction."). When there are key facts in dispute, a motion for preliminary injunction should be denied. *Heyman v. Ar. Winarick, Inc.,* 166 F. Supp. 880, 883 (S.D.N.Y. 1958) ("Where sharp issues of fact are presented it is apparent that the case is not a fit one for preliminary relief and the resolution of the disputed issues must await trial."). Here, IBM has failed to make the necessary showing for this extraordinary relief.

## I.     IBM HAS FAILED TO DEMONSTRATE IRREPARABLE HARM

To prevail on its motion, IBM must do more than show that an injury is possible; it must show that the injury "is neither remote nor speculative, but actual and imminent." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005). Irreparable harm is the "most important prerequisite for the issuance of a preliminary injunction." *Bell & Howell v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983). As set forth below, IBM has not met that burden.

### A.     There Has Been No Actual Misappropriation

McIntyre has not committed (or threatened) to use, disclose, or misappropriate any IBM confidential or proprietary information. Quite the contrary, McIntyre has been clear that she fully intends to respect her obligations to preserve the confidentiality of any such information and that her new position at Microsoft will in no way implicate its use. (McIntyre Decl. ¶¶ 15, 21, 34.) Moreover, McIntyre has been transparent with IBM about her role with Microsoft, and McIntyre and Microsoft have committed to follow a set of protocols to assure IBM that she will in no way competitively disadvantage IBM. (*Id.* ¶ 34.)

Although a simple point, this fact alone is sufficient to defeat IBM's present motion. *See, e.g.*, *SG Cowen Sec. Corp. v. Messih,* 224 F.3d 79, 85 (2d Cir. 2000) (stating that "it is difficult to see how [the prior employer] is seriously harmed" by denying an injunction where employee

agreed to not divulge trade secrets or other confidential information); *Am. Airlines, Inc. v. Imhof*, 620 F. Supp. 2d 574, 576-85 (S.D.N.Y. 2009) (concluding that plaintiff could not show irreparable harm where the defendant had offered to return or destroy all confidential information); *see also Indotronix Int'l Corp. v. Ayyala*, 888 N.Y.S.2d 170, 171 (2d Dep't 2009) (where ten-year former employee, who accepted position with another company performing the same services within the telecommunications industry, "submitted evidence demonstrating that [he] did not disclose any confidential or proprietary information" to his new employer, former employer could not defeat summary judgment on breach of contract or misappropriation claims with "unsubstantiated assertions and speculations").

**B.   IBM Cannot Salvage Its Motion by Resorting to the "Inevitable Disclosure" Doctrine**

To the extent that IBM attempts to rely on the "judicially disfavored" doctrine of inevitable disclosure as the basis for a finding of irreparable harm, its claim would be misguided. *See EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 310 (S.D.N.Y. 1999), *aff'd*, 2000 WL 1093320, at *2 (2d Cir. May 18, 2000) ("[T]he inevitable disclosure doctrine treads an exceedingly narrow path through judicially disfavored territory."); *Boston Laser, Inc. v. Qinxin Zu*, No. CIV.A. 3:07-CV-0791, 2007 WL 2973663, at *9 n.12 (N.D.N.Y. Sept. 21, 2007), *report and recommendation adopted*, 2007 WL 2973590 (N.D.N.Y. Oct. 9, 2007) (stating that the doctrine of inevitable disclosure "is disfavored in New York as a basis for an irreparable harm finding, based primarily on this State's strong public policy against restrictive non-competition agreements"). Indeed, the New York Supreme Court's Appellate Division concluded that "the doctrine of inevitable disclosure is disfavored . . . absent evidence of actual misappropriation by an employee." *See Marietta Corp. v. Fairhurst*, 754 N.Y.S.2d 62, 65-66 (3d Dep't 2003). As a result, New York courts hold that "[a]bsent evidence of actual misappropriation by an employee,

the doctrine [of inevitable disclosure] should be applied in only the rarest of cases." *EarthWeb*, 71 F. Supp. 2d at 310. Here, no evidence of misappropriation exists, and no rare and special circumstance suggests that the doctrine of inevitable disclosure should be applied to this case.

Even assuming, *arguendo*, that the inevitable disclosure concept had any relevance here, it would be of no help to IBM, which has not established that McIntyre has threatened to, or will imminently, disclose any trade secrets. When determining whether the disclosure of trade secrets is inevitable, courts evaluate certain factors, including:

> (1) the employers in question are direct competitors providing the same or very similar products or services; (2) the employee's new position is nearly identical to [her] old one, such that [she] could not reasonably be expected to fulfill [her] new job responsibilities without utilizing the trade secrets of [her] former employer; and (3) the trade secrets at issue are highly valuable to both employers. Other case-specific factors such as the nature of the industry and trade secrets should be considered as well.

*EarthWeb*, 71 F. Supp. 2d at 310.

While IBM and Microsoft arguably compete on certain products in the technology sector, Microsoft in no way concedes, or agrees, that IBM and Microsoft are competitors in their attempts to create inclusive and diverse workforces. If IBM suggests that IBM and Microsoft compete for diverse talent, then *every* business would be a "competitor" as businesses in all industries seek to create inclusive and diverse workforces. Under this theory, McIntyre would be prohibited from joining companies in any field and be unable to pursue her chosen profession as a diversity and inclusion professional. Any assertion by IBM that Microsoft is a direct competitor in seeking to offer a diverse and inclusive work environment is blatantly anti-competitive and impermissible under the law. Even assuming, *arguendo*, that IBM and Microsoft are competitors, IBM cannot establish the remaining factors.

First, McIntyre's new position is different from her old position in its duties and responsibilities. At Microsoft, she will be responsible for diversity engagement and planning

with Microsoft employees, engaging Microsoft's diverse communities, and enhancing Microsoft's own culture of inclusion.  (McIntyre Decl. ¶ 11.)  She will have no responsibilities with respect to three important functions of her role at IBM—succession planning, EEO compliance and reporting, and recruiting for positions outside her department.  (*Id.* ¶¶ 13, 19, 34.)  Indeed, both McIntyre and Microsoft have expressed their willingness to work with IBM to ensure that McIntyre does not perform duties that would threaten any IBM protectable interests.  (*Id.* ¶ 34.)  In sum, McIntyre's positions at IBM and Microsoft are not "nearly identical." *See Int'l Bus. Machs. Corp. v. Visentin*, No. 11 CIV. 399 LAP, 2011 WL 672025, at *17-19 (S.D.N.Y. Feb. 16, 2011), *aff'd*, 437 F. App'x 53 (2d Cir. 2011) (finding former IBM employee's new position was not "nearly identical" to his IBM position despite "potential overlap" with some of his IBM responsibilities).

Second, IBM's purported diversity-related trade secrets are not valuable to Microsoft, nor would McIntyre be able to use them in her role at Microsoft.  Although McIntyre generally had access to IBM's voluminous statistical equal employment opportunity ("EEO") data, she did not take any of this data and has not committed to memory EEO information about IBM's approximately 380,000 employees.  (McIntyre Decl. ¶¶ 15, 21.)  Moreover, McIntyre's work at Microsoft will be focused on Microsoft's corporate culture and its internal goals as an organization, which are entirely distinct from IBM's culture and goals.  (*Id.* ¶ 12.)  Additionally, Microsoft already has its own systems and methodology for measuring and monitoring diversity, so McIntyre's limited technical knowledge of IBM's procedures would be irrelevant to Microsoft.  (*Id.* ¶¶ 16, 18, 19.)  Finally, Microsoft advised IBM that it would institute a set of protocols for McIntyre's position at Microsoft to assure IBM that her hiring by Microsoft would in no way competitively disadvantage IBM.  (*Id.* ¶ 34.)  Simply put, IBM cannot demonstrate

that any confidential information to which McIntyre was exposed could be used to help Microsoft compete with IBM. *See Visentin*, 2011 WL 672025, at *20 (concluding that any confidential information retained by a former IBM employee would be of no value to his new employer because he "could not possibly remember" the thousands of deals in IBM's pipeline, and he could not use IBM's desired profit margin because "he could not remember all the deals because he possesses no documents" and his new employer may have a different cost structure).

Third, there is a growing trend of transparency in the technology industry regarding companies' diversity initiatives and EEO data, the purported trade secrets at-issue here. (*Id.* ¶¶ 22-26; Estreicher Decl. ¶¶ 7-8.) For instance, many well-known companies in the technology industry publish their diversity data, including Microsoft, Amazon, Apple, Facebook, Google, and Intel. (McIntyre Decl. ¶¶ 22-23.) Further, most technology companies, including IBM, publicly release significant information about their diversity programs in order to attract diverse candidates. (*Id.* ¶¶ 27-33; Estreicher Decl. ¶¶ 3-4.) In sum, technology companies are working collectively to solve the diversity problem within the technology industry.

Based on the relevant factors, IBM cannot present sufficient evidence to invoke the doctrine of inevitable disclosure to support its claim that it will be irreparably harmed absent the issuance of an injunction. While IBM may claim that business information that McIntyre had access to during her employment were in fact trade secrets, "these conclusory allegations do not provide an adequate basis upon which to determine whether [McIntyre] would necessarily recall and disclose such secrets in [her] new employment (assuming she acts in the best of faith), the value of the trade secrets to [Microsoft], the harm to [IBM] that would be caused by disclosure and the role and nature of trade secrets within the industry in which [IBM] and [Microsoft] compete." *See Spinal Dimensions, Inc. v. Chepenuk*, No. 4805-07, 2007 WL 2296503, at *8

(N.Y. Sup. Ct. Albany Cty. Aug. 9, 2007).  Even if McIntyre "is aware of information that could be afforded secret protection," IBM has not shown "an imminent and inevitable risk of disclosure warranting preliminary relief," because McIntyre's job responsibilities purposefully will not be the same as the services she performed at IBM, and McIntyre can divorce the knowledge that she gained at IBM from the professional skills and expertise that she has developed over her career. *See EarthWeb*, 71 F. Supp. 2d at 316.[2]

Indeed, in *American Airlines*, the Court held that, even where the defendant negotiated his new position while still employed with plaintiff, accepted an "identical or nearly identical" role with a competitor, and took plaintiff's confidential and competitively sensitive information, the plaintiff still failed to meet its burden of showing irreparable harm.  620 F. Supp. 2d at 576-85.[3]  The circumstances here are far more compelling, and, despite its lengthy speculation to the contrary, IBM simply cannot put forward sufficient evidence to demonstrate that "inevitable disclosure" of trade secrets justifies a preliminary injunction.

---

[2] *International Business Machines Corporation v. Papermaster*, No. 08-CV-9078 (KMK), 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008) is easily distinguishable.  In *Papermaster*, the defendant was a former IBM Vice President with highly technical expertise and knowledge of IBM's "power architecture" trade secrets and had worked on microprocessors.  2008 WL 4974508 at *2.  He was recruited away from IBM specifically to manage the development of consumer electronics products for a competitor in the field of microprocessor technology. *Id.* at *5.  The court described Papermaster as IBM's "top expert in the development and application" of the technology at issue. *Id.* at *8.  The court found that because the employee's ultimate task at the new employer was to make its microprocessors more efficient, it was inevitable that he would bring his technological expertise to bear in his new role. *Id.* at *8-9.  That is not the case here.

[3] Nor was the Court blind to the concept that a 22-year employee in a high-level position would not leave his former employer "with his mind a *tabula rasa*," and in fact assumed that he "retained some information that [the plaintiff] properly regards as secret and competitively sensitive," but instead held that "some risk of some irreparable injury" does not "justify the conclusion that the risk is very high or the extent of the threatened injury would be very great." *Am. Airlines*, 620 F. Supp. 2d at 585-86; *see also Metito (Overseas) Ltd. v. Gen. Elec. Co.*, No. 05 CIV. 9478(GEL), 2009 WL 399221, at *11-12 (S.D.N.Y. Feb. 18, 2009) (dismissing plaintiff's claims in the absence of evidence of "actual disclosure" because "the mere fact that a person assumed a similar position at a competitor does not, without more, make it inevitable that he will use or disclose trade secret information").

### C.   IBM Cannot Discharge Its Burden by Relying on the Terms of the Agreement

IBM may seek to avoid its duty of showing imminent and irreparable harm by relying on boilerplate language in the Noncompetition Agreement—which was indisputably drafted by IBM without any opportunity or input from McIntyre—and suggesting that such language should give rise to a presumption of actual harm.

As an initial matter, courts must avoid "categorical" rules or presumptions of irreparable harm and instead must conduct an individualized inquiry into the actual harm that would befall the plaintiff in the absence of preliminary relief. *See, e.g.*, *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010). In other words, McIntyre's acknowledgment in the Noncompetition Agreement that IBM "would suffer irreparable harm" if she were to breach the agreement is not dispositive on the issue, and IBM still must present additional evidence of irreparable harm in order to prevail on that factor of the preliminary injunction test. *See, e.g.*, *Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987) ("We also agree with the district court that the contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate."); *Visentin*, 2011 WL 672025, at *7 n.4 (stating that IBM cannot "by including certain language in that contract, create a right to injunctive relief where it would otherwise be inappropriate"). Here, because there is no allegation, let alone competent evidence, of actual or threatened misappropriation, because there is no basis for concluding that there is a strong likelihood that misappropriation is inevitable, and because all of the facts in the record suggest that McIntyre has no intention of misusing information deemed confidential by IBM and will not be in a position to do so anyway, IBM has not—and cannot—establish the essential prerequisite of actual, imminent harm.

Moreover, in the unlikely event that IBM were to ultimately prevail on its claims, IBM could be fully compensated by an award of monetary damages. *See Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118-19 (2d Cir. 2009) ("Where a misappropriator seeks only to use [trade] secrets … in pursuit of profit … an award of damages will often provide a complete remedy for such an injury.").

## II.  PLAINTIFF CANNOT ESTABLISH A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS

Before preliminary relief will be granted, the movant must demonstrate a "strong likelihood of success in the dispute," *SG Cowen*, 224 F.3d at 82, and that "absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent.'" *Donohue v. Paterson*, 715 F. Supp. 2d 306, 314 (N.D.N.Y. 2010) (quoting *Freedom Holdings*, 408 F.3d at 114). A "clear showing of probable success" is required in the Second Circuit to show a likelihood of success on the merits. *Id.* For the reasons set forth below, IBM cannot demonstrate a strong likelihood of success on either of its claims.

### A.  The Agreements Are Unenforceable Under New York Law

The Noncompetition Agreement purports to restrict McIntyre from engaging or associating with any **"Business Enterprise" or "any competitor" of IBM** in any job or capacity. (McIntyre Decl., Ex. A ¶ 1(c) (emphasis added).) The Noncompetition Agreement defines "Business Enterprise" as "any entity that engages in, or owns or controls an interest in any entity that engages in, competition with any business unit or division of [IBM] in which you worked at any time during the three (3) year period prior to the termination of your employment." (*Id.*, Ex. A ¶ 2(a).) As written, this breathtakingly overbroad non-competition agreement would not only prevent McIntyre from working in her area of expertise as a diversity

professional in any role, but would literally prevent her from taking any position in any role at Microsoft without regard to level or subject matter.

The IBM non-competition agreement in this case has been subject to judicial scrutiny in this Circuit on multiple occasions. The instant case is similar to this Court's *Visentin* decision, affirmed by the Second Circuit, denying a preliminary injunction. In that case, the General Manager of IBM's Integrated Technology Services business segment resigned his position and accepted employment at Hewlett-Packard Company. 2011 WL 672025, at *2-5. IBM sought a preliminary injunction to enforce its non-competition agreement to restrain defendant from working at Hewlett-Packard for a period of twelve months. *Id.* at *1. The Court held that IBM failed to identify a legitimate interest to protect because "IBM has not demonstrated that it seeks to protect trade secrets or confidential information from misappropriation by Mr. Visentin." *Id.* at *22. In addition, the Court was not persuaded that the nature of defendant's new position at Hewlett-Packard would require him to use or disclose IBM's confidential information. *Id.* at *20. Further, the Court found that the IBM non-competition agreement was "facially overbroad." *Id.* at *21. Finally, the Court found that enforcement of the non-competition agreement would impose an undue hardship on defendant's future employment prospects because, while not a "technical" employee, "being sidelined for the next year will place him at a disadvantage in an industry that evolves quickly." *Id.* at *23.[4]

In fact, McIntyre's restrictions are identical to those that were at issue in *Visentin*. So IBM asks this Court to enforce restrictions that this Court has already concluded are void.

---

[4] *Papermaster* is not to the contrary. In that case, the defendant held a "design and development" role in IBM's Systems and Technology Group, and was regarded as IBM's "top expert" in a unique microchip technology and was viewed across the industry as a preeminent figure in microchip design. 2008 WL 4974508 at *2. The defendant worked for years with the "crown jewels of IBM's technology" and was aware of IBM's "most sensitive" and "jealously guarded" trade secrets. *Id.* at *8. Thus, IBM was able to establish a protectable legitimate interest. In contrast, IBM has fallen far short of showing that McIntyre was privy to the same sort of technological know-how or design expertise (the "crown jewels") as the defendant in *Papermaster*, and thus the case is inapposite.

*Visentin*, 2011 WL 672025, at * 21 (finding the prohibitions at issue "facially overbroad because they are greater than necessary to protect IBM's legitimate interests").

Likewise, in *International Business Machines Corporation v. Johnson*, 629 F. Supp. 2d 321, 335 (S.D.N.Y. 2009), *aff'd*, 355 F. App'x 454 (2d Cir. 2009), this Court rejected IBM's attempt to enjoin its former Vice President of Corporate Development from assuming a role at Dell.   629 F. Supp. 2d at 323-24.   Even though defendant possessed "inside strategic business information about IBM," the Court found that IBM "overstate[d] its case," because the former employee "d[id] not have the sort of information that is considered quintessential trade secret information—detailed technical know-how, formulae, designs or procedures." *Id.* at 335. Importantly, the Court distinguished *Papermaster* as involving a defendant who worked with the "crown jewels" of IBM's technologies for years and had been "inculcated" with detailed technical knowledge.   *Id.* at 336.   Moreover, the Court held that preventing defendant from working in his field for a year "would cause him not insubstantial harm." *Id.* at 336 ("[G]iven that Mr. Johnson does not have detailed technical know-how regarding technology products, his ability to stay *au courant* with industry rumors and developments is fundamental."). Here, as in *Visentin* and *Johnson*, IBM cannot establish that the non-competition provision is enforceable.[5]

Indeed, this Court enforces restrictive covenants only "to the extent that the covenant is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *AM Medica Commc'ns Grp. v. Kilgallen*, 261 F. Supp. 2d 258, 262 (S.D.N.Y. 2003).   A court will consider

---

[5] There is evidence that IBM's intention in requiring McIntyre and others to sign the Noncompetition Agreement was not to protect its trade secrets, but rather to "protect the talent of IBM from leaving." *See Visentin*, 2011 WL 672025, at *22.   Randall MacDonald, IBM's Senior Vice President for Human Resources (the IBM officer who signed McIntyre's Noncompetition Agreement), testified that the Noncompetition Agreement was targeted at keeping talent employed at IBM. *Id.* at *23 (finding that IBM's purpose for non-competition program "was not to protect its legitimate interests but to prevent its employees from taking employment elsewhere").

whether a non-competition agreement is reasonable only after finding it is necessary to protect against "unfair and illegal" conduct and not merely to insulate the employer from competition. *See Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382, 387 (2d Cir. 1982).

Under well-established New York law, "[r]egardless of the existence of a restrictive covenant between an employee and a former employer, courts disfavor any action which sanctions the loss of a person's livelihood." *Price Paper and Twine Co. v. Miller*, 582 N.Y.S.2d 746, 748 (2d Dep't 1992). Further, "New York courts are loath to enforce restrictive covenants absent a showing of misappropriation of confidential information of trade secret status." *Pella Windows & Doors v. Buscarnera*, No. 07 CV 82, 2007 WL 2089298, at *9 (E.D.N.Y. July 18, 2007). Thus, "[c]ourts will not impede an employee's ability to compete with a former employer unless the evidence is clear and convincing that it is necessary to protect the trade secrets of the employer or that fraudulent methods were used by the employee to disparage the employer's business." *Price Paper*, 582 N.Y.S.2d at 748. IBM is unable to meet its heavy burden of establishing a "strong likelihood" of success on the merits.

1.  IBM Cannot Demonstrate, by Clear and Convincing Evidence, That Enforcement Is Necessary to Protect a Legitimate Interest

IBM bears the burden of establishing that enforcement of the Noncompetition Agreement against McIntyre (1) is "necessary" to protect its asserted interests, (2) those interests are legitimate, and (3) it must do so by "clear and convincing evidence." *Price Paper*, 582 N.Y.S.2d at 748. "[C]ognizable employer interests … [are] limited to misappropriation of the employer's trade secrets or confidential client lists or protection from competition from a former employee whose services are unique or extraordinary." *Ellison Sys., Inc. v. Ayala*, No. 0600500/2007, 2008 WL 2625144 (N.Y. Sup. Ct. N.Y. Cty. June 24, 2008). IBM cannot demonstrate by clear and convincing evidence that enforcement is necessary to protect any legitimate interest.

IBM has identified only one purported interest for its requested relief—its conclusory claims that McIntyre may disclose IBM trade secrets to Microsoft.[6]  First, McIntyre has reaffirmed she will honor her post-employment confidentiality and non-disclosure obligations completely.  (McIntyre Decl. ¶¶ 15, 21, 34.)  Even more fundamentally, IBM cannot establish that McIntyre has any protectable IBM trade secrets.  A trade secret is "any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."  *Ashland Mgmt., Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993).[7]  According to the standard affirmed by the Second Circuit for what constitutes a trade secret under New York law, McIntyre—the former head of diversity at IBM—does "not have the sort of information that is considered quintessential trade secret information—detailed technical knowledge, formulae, designs, or procedures."  *See Johnson*, 629 F. Supp. 2d at 335, *aff'd*, 355 F. App'x 454 (2d Cir. 2009).

As an initial matter, much of the information pertaining to the purported trade secrets is publicly available.  When analyzing whether information is a trade secret, "[t]he most important consideration remains whether the information was secret."  *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986).  IBM publicly discloses its diversity efforts through its own website.  (McIntyre Decl. ¶ 29.)  For example, IBM's 2016 Corporate Responsibility Report includes a section on "employee inclusion," which discusses IBM's efforts related to the advancement of women, hiring people with disabilities, and IBM's Business Resource Groups

---

[6] IBM has the burden to "describ[e] the alleged trade secret with adequate specificity to inform the defendants what is alleged to have misappropriated."  *See sit-up Ltd. v. IAC/InterActive Corp.*, No. 05-CV-9292 (DLC), 2008 WL 463884, at *11 (S.D.N.Y. Feb. 20, 2008).

[7] To determine whether information constitutes a trade secret, New York courts consider the following factors: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."  *Ashland*, 82 N.Y.2d at 407.

(affinity groups).[8]   In addition, IBM provides details of its diversity initiatives to diversity-related organizations and publications in the hopes of winning awards for those efforts.   For example, IBM recently disclosed information to Catalyst Inc. and *Working Mother* regarding certain diversity initiatives and female representation statistics as part of those organizations' recognition of IBM's diversity efforts.[9]   During McIntyre's employment with IBM, the company encouraged her to publicly share IBM's diversity initiatives via media interviews and blog posts on IBM's website.   (*Id.* ¶ 30.)   The fact that IBM's information is not secret is dispositive, and its Motion, for that reason alone, fails as a matter of law.   *See Visentin*, 2011 WL 672025, at *8-16 (denying preliminary injunction motion where IBM failed to establish existence of trade secrets, many of which overlapped and also included information that was "either applicable to all large corporations, in the public domain, or outdated"); (Estreicher Decl. ¶¶ 3-4.)

Moreover, even if Plaintiff's alleged trade secrets were in fact secret, McIntyre's employment at Microsoft does not pose a risk to IBM's information.   New York courts consistently recognize that "mere knowledge of the intricacies of a business is simply not enough" to constitute a trade secret.   *Marietta*, 754 N.Y.S.2d at 67; *see also Silipos, Inc. v. Bickel*, No. 1:06-cv-02205, 2006 WL 2265055, at *4 (S.D.N.Y. Aug. 8, 2006) (finding things like "strategy information, such as future marketing plans" are not trade secrets).   Although McIntyre may have some knowledge of IBM's future diversity-related strategic plans, such information is not trade secret information.   *See Johnson*, 629 F. Supp. 2d at 335 (finding IBM "overstated its case" that employee possessed trade secrets where he did "not have the sort of information that is considered quintessential trade secret information—detailed technical know-

---

[8]   *See*   IBM,   *2016   Corporate   Responsibility   Report*   (June   2017), https://www.ibm.com/annualreport/2016/images/downloads/IBM-Annual-Report-2016.pdf.

[9] *See* Catalyst, Inc., *IBM—Leading the Cognitive Era Powered by the Global Advancement of Women* (Jan. 18, 2018),   http://www.catalyst.org/knowledge/ibm-leading-cognitive-era-powered-global-advancement-women; Working Mother, *Best Companies: IBM* (Sept. 26, 2017), https://www.workingmother.com/best-companies-ibm.

how, formulae, designs, or procedures."). Further, McIntyre's experience, knowledge, and skills acquired during her employment at IBM are not trade secrets. (Estreicher Decl. ¶ 9.)

IBM will raise several meritless arguments regarding information allegedly in McIntyre's possession that it claims should be afforded protection:

- While McIntyre was exposed to confidential diversity data related to IBM's workforce, she has neither committed the data related to IBM's approximately 380,000 employees to memory nor taken any materials that reveal the data. (McIntyre Decl. ¶¶ 15, 21.) Not only is IBM's diversity data not entirely secret, but it has no competitive value and could not be used by Microsoft to unfairly compete against IBM. (*Id.* ¶¶ 15, 21, 25-26.) In other words, McIntyre does not need this information to do her job, nor would it help her to be successful.

- The only software used by IBM to extract value from its diversity data that McIntyre is aware of is a cognitive bot/assistant that analyzes demographic data and highlights where a group can improve diversity in its applicant pool and interview selections. (*Id.* ¶ 16.) McIntyre does not have any knowledge of the analytics or the algorithm design, and she does not possess the technical skill or knowledge to recreate this software. (*Id.*) In any event, Microsoft has its own systems for measuring and tracking diversity. (*Id.*)

- McIntyre was not involved in developing any proprietary methodology for rewarding managers for meeting diversity goals. (*Id.* ¶ 18.) Before she became the Chief Diversity Officer, IBM already had a qualitative metric that scored business segments on achieving the organization's aspirational diversity goals. (*Id.*) In any event, Microsoft has its own methodology for monitoring diversity metrics. (*Id.*)

- McIntyre does not have any knowledge of the analytics or the algorithm design behind artificial intelligence tools, which have been developed by IBM to track career development

goals.  (*Id.* ¶ 19)  She does not possess the technical experience to replicate these programs.  (*Id.*)  Further, these projects related to her work on succession planning at IBM, which she will not be doing at Microsoft.  (*Id.*)

- McIntyre is aware that IBM engaged in a project to recruit 50 diverse candidates, but she was not involved in the identification or selection of the prospective candidates.  (*Id.* ¶ 20.)  McIntyre merely served as a pass-through to share updates on the program to IBM's CEO in monthly five-minute updates.  (*Id.*)  McIntyre is unaware of the candidates not yet hired, the status of any such candidates, or of any individuals being pursued or interviewed.  (*Id.*)

All of this information is either (1) no use to McIntyre in her role at Microsoft, (2) irrelevant to Microsoft because it maintains its own systems and methodology to measure and monitor diversity metrics, or (3) cannot be replicated by McIntyre.  Clearly, none of this information requires protection as trade secrets.[10]

---

[10] In an entirely different context—motions to seal specific documents in a pending class action litigation—Microsoft argued that certain documents reflecting its diversity initiatives, strategy, and representation data should be sealed from public disclosure for, among other reasons, competitive considerations.  Those motions addressed a small subset of the many documents related to diversity programming and diversity statistics that Microsoft produced in the litigation.  *See Moussouris v. Microsoft Corp.*, No. 2:15-cv-01483-JLR (W.D. Wash.), Dkts. 177, 178, 269, 272, 280, 283, 296.  Any argument by IBM that Microsoft's prior statements made on a motion to seal are relevant to a determination of a motion for a TRO to enforce a non-compete agreement is completely misguided.  First, the statements were made in an entirely different context, attempting to shield specific documents from public disclosure in the course of a class action litigation.  For example, if specific diversity data, names of job incumbents, and other detailed information about Microsoft's human capital were publicly revealed, anyone—including competitors, headhunters, or potential future litigants—could have access to information not otherwise publicly available and could use that information to Microsoft's disadvantage.  Those reasons are wholly unrelated to the circumstances here, where IBM seeks to prevent a single individual, McIntyre, not from making any public or private disclosures or using IBM confidential information, which she is contractually obligated not to do, but from working for Microsoft.  Second, Microsoft's motions to seal related to preventing the public disclosure of *specific documents*, not an effort to prevent someone from working for a new employer merely because he or she may have been exposed to confidential information during the course of his or her employment.  Third, Microsoft in the *Moussouris* litigation did not argue that all diversity-related information about Microsoft's diversity programs and data should be protected from public disclosure (as much of that information is in the public domain), only the sensitive documents referenced in the motions to seal.  Fourth, Microsoft's statements should not distract from the fact that neither McIntyre nor Microsoft would have any competitive use for any IBM information that McIntyre may have in her memory.

Similarly, Microsoft's arguments for withholding certain statistical analyses from discovery in the *Moussouris* matter are irrelevant here.  *See Moussouris*, Dkts. 88, 152.  Microsoft invoked the attorney-client privilege to withhold certain statistical analyses related to Microsoft's compensation, performance review, and promotion

In any event, even if McIntyre possessed IBM's trade secret information, there is no danger of her using any of that information in her new position. At Microsoft, McIntyre will not be working in an area that competes with IBM. Rather, she will be responsible for Microsoft's internal diversity and inclusion efforts. (McIntyre Decl. ¶ 11.) Importantly, McIntyre will not be responsible for executive succession, EEO compliance and reporting, or external recruiting for positions outside her department, as she was at IBM. (*Id.* ¶¶ 13, 19, 34). Therefore, she will not be working in a position where she would even have a use for any of IBM's non-public information. *See Visentin*, 2011 WL 672025, at *10 (denying injunctive relief in part because "[i]n a majority of the areas of information that IBM now seeks to protect as 'trade secrets' … [it] failed to provide specific examples of confidential or trade secret information that could actually be used to IBM's detriment if [defendant] were allowed to assume his new position…."). Additionally, McIntyre is subject to non-disclosure and confidentiality obligations, which she has affirmed she will honor. (McIntyre Decl. ¶¶ 15, 21, 34.) Thus, it is clear that enforcement of the Noncompetition Agreement is not necessary to protect IBM's purported trade secrets.[11] *See SG Cowen*, 224 F.3d at 85 (stating that "it is difficult to see how [the prior employer] is seriously harmed" by denying an injunction where employee agreed to not divulge trade secrets or confidential information).

2.    The Scope of the Agreements Is Overly Broad and Unreasonable

The Noncompetition Agreement prohibits McIntyre from employment with all competitors of IBM anywhere in the world for a period of one year following the termination of

---

practices conducted by outside counsel. Importantly, Microsoft produced all of the underlying data during discovery in that case. In sum, Microsoft's positions in the *Moussouris* case are entirely irrelevant here.

[11] Moreover, McIntyre's considerable skill and talent, while valuable, do not make her a unique or extraordinary employee whose services constitute a legitimate protectable interest justifying injunctive relief. *See Newco Waste Sys., Inc. v. Swartzenberg*, 510 N.Y.S.2d 399, 400 (4th Dep't 1986) (denying injunctive relief and holding that former chief operating officer and vice president, "though a highly paid and extremely valuable corporate officer, [was] neither … irreplaceable nor … caused special harm to his employer by his leaving").

her employment.  As discussed *supra*, the prohibitions IBM seeks to enforce are identical to those that this Court concluded were void and overbroad in *Visentin*.  Simply, the geographical and temporal reach of these restrictions is grossly overbroad and entirely unnecessary.  *See Visentin*, 2011 WL 672025, at *21 ("At first blush, [IBM's] agreement is overbroad because it prohibits competition in areas where IBM simply has no legitimate business interest."); *EarthWeb*, 71 F. Supp. 2d at 313 (finding a one-year restrictive covenant overbroad "given the dynamic nature of [the] industry, its lack of geographical borders, and [the defendant's] former cutting-edge position … where his success depended on keeping abreast of daily changes"); (Estreicher Decl. ¶ 10).  Accordingly, the Noncompetition Agreement is unenforceable.

**B.**   **IBM Cannot Establish an Entitlement to Partial Enforcement**

IBM cannot make the requisite showing to justify this Court's re-writing of the terms of the Noncompetition Agreement.

First, where there is no legitimate employer interest to protect, a restrictive covenant is *per se* unenforceable "and the issue of partial enforcement does not apply." *Allways Elec. Corp. v. Abrams*, 902 N.Y.S.2d 670, 671 (2d Dep't 2010).  As explained above, IBM simply cannot carry its burden of demonstrating a legitimate interest recognized under the law.

Second, where an employer grossly overreaches in its attempt to secure an employee's agreement to a restrictive covenant, courts will not reward such behavior by rewriting the agreement to reflect a reasonable one. *See Scott, Stackrow & Co., C.P.A.'s, P.C. v. Skavina*, 780 N.Y.S.2d 675, 678 (3d Dep't 2004) (refusing to partially enforce overly broad restrictive covenant).  Here, the overbroad Noncompetition Agreement would effectively prohibit McIntyre from working for a technology company without regard for McIntyre's responsibilities at IBM or her new role.  IBM cannot justify the Court's correction of IBM's overreaching.

### III.   THE BALANCE OF EQUITIES DOES NOT FAVOR IBM

Absent a clear and substantial likelihood of success on the merits, IBM must show that the balance of hardships is "decidedly in [its] favor." *Doninger*, 527 F.3d at 47.   IBM cannot show that it will actually suffer any harm if McIntyre works for Microsoft in a position that does not involve areas in which IBM and Microsoft compete.[12]   Moreover, there is nothing to indicate that McIntyre will not faithfully respect her non-disclosure obligations to IBM.   This case is entirely devoid of allegations that McIntyre is untrustworthy or engaged in any misconduct.

In contrast, McIntyre will suffer significant harm if she is prevented from working for Microsoft.   If McIntyre, the primary breadwinner of her family and mother of three young children, cannot immediately continue her career at Microsoft, her family will face significant hardship due to the loss of her income.   (McIntyre Decl. ¶ 36.)   Prohibiting McIntyre, who is at the peak of her career, from working in her chosen industry for one year would significantly impede her ability to obtain a senior position at a technology company.   The Court in *Johnson* recognized such harm as the defendant in that case, like McIntyre, had a special need to "stay *au courant* with industry rumors and developments" in the technology field, presenting a risk that forcing the defendant to "sit on the sidelines of the ever changing and evolving technology industry" might render his skills "obsolete." *Johnson*, 629 F. Supp. 2d at 336-37.

Further, public policy tips the balance of hardships against IBM.   First, New York public policy disfavors non-competition agreements. *See id.* at 337 (holding that New York's public policy strongly disfavoring non-competition agreements was "another factor in determining that the balance of equities here does not tip decidedly in favor of IBM").   Second, diversity is an

---

[12] Recently, three Microsoft employees in recruiting roles left Microsoft to assume similar roles at IBM. Whittinghill Decl. ¶ 3.   Despite these former employees' non-competition agreements, the similarities of their roles at Microsoft and IBM, and the confidential information they had access to at Microsoft, Microsoft did not prevent these individuals from assuming new roles with IBM.   (*Id.* ¶ 13.)

important public policy concern, and preventing McIntyre from assuming a leadership role in this area at Microsoft is misguided.[13]   Accordingly, IBM cannot establish that the balance of hardships tips decidedly in its favor in this case.

## CONCLUSION

For the foregoing reasons, IBM's Motion for a Temporary Restraining Order and Preliminary Injunction should be denied.

Dated: February 12, 2018

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _Michael Delikat_                     /mp
                       Michael Delikat
                       James H. McQuade

51 West 52nd Street
New York, New York 10019
(212) 506-5000
mdelikat@orrick.com
jmcquade@orrick.com

Of counsel:

MORGAN, LEWIS & BOCKIUS LLP
Sarah Bouchard
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5000
sarah.bouchard@morganlewis.com

*Attorneys for Defendant Lindsay-Rae McIntyre*

---

[13]   *See* Equal Employment Opportunity Comm'n, *Diversity in High Tech*, https://www.eeoc.gov/eeoc/statistics/reports/hightech/ ("[A]ddressing the lack of diversity among high tech workers ha[s] become [a] central public policy concern[].").