

February 21, 2018

**Orrick, Herrington & Sutcliffe LLP**
51 West 52nd Street
New York, NY 10019-6142

+1 212 506 5000
**orrick.com**

VIA ECF

The Honorable Paul E. Davison
United States Magistrate Judge
The Honorable Charles L. Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas St.
White Plains, NY 10601-4150

Michael Delikat
(212) 506-5230
mdelikat@orrick.com

Re:   *International Business Machines Corporation v. Lindsay-Rae McIntyre*,
      No. 7:18-cv-01210-VB

Dear Judge Davison:

On behalf of Defendant Lindsay-Rae McIntyre ("McIntyre"), we submit this letter in connection with the settlement conference scheduled for February 22, 2018 in this matter.  Given that this settlement conference was scheduled on very short notice, for a full background on this case, we respectfully refer Your Honor to Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction, Dkt. 14, Declaration of Lindsay-Rae McIntyre, Dkt. 15 ("McIntyre Decl."), Declaration of Samuel Estreicher, Dkt. 16, and Declaration of Joseph Whittinghill, Dkt. 17.  The following letter addresses some additional points raised in Plaintiff International Business Machines Corporation's ("IBM") opening brief and during the hearing on IBM's motion for a temporary restraining order.

## I.   New York Courts Strictly Scrutinize Non-competition Agreements

Unlike ordinary contracts, employee non-competition agreements are subject to strict scrutiny by New York courts.  *See Am. Broad. Companies, Inc. v. Wolf*, 52 N.Y.2d 394, 403 (1981) ("Even where there is an express anticompetitive covenant, however, it will be *rigorously examined* and specifically enforced only if it satisfies certain established requirements.") (emphasis added); *see also* Restatement (Second) of Contracts § 188 ("Post-employment restraints are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through loss of his livelihood.  This is especially so where the restraint is imposed by the employer's standardized printed form.").



Page 2

To determine whether a non-competition agreement is specifically enforceable, New York courts have adopted the prevailing common law reasonableness standard. *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 389 (1999). In the employment context, a restrictive covenant will only be subject to specific enforcement to the extent that it (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public. *Id.* In applying this standard, courts must weigh the need to protect the employer's legitimate business interests with the employee's concern regarding the possible loss of livelihood, a result strongly disfavored by public policy in New York. *Int'l Bus. Machines Corp. v. Visentin*, No. 11 CIV. 399 LAP, 2011 WL 672025, at *21 (S.D.N.Y. Feb. 16, 2011), *aff'd*, 437 F. App'x 53 (2d Cir. 2011). In general, New York courts "have *strictly applied* the rule to limit enforcement of broad restraints on competition." *BDO Seidman*, 93 N.Y.2d at 389 (emphasis added).

Further, the existence of contractual provisions in McIntyre's Non-competition Agreement acknowledging the availability of injunctive relief are not dispositive of the analysis on irreparable harm. *See, e.g.*, *Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987) ("We also agree with the district court that the contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate."); *Visentin*, 2011 WL 672025, at *7 n.4 (rejecting IBM's argument that former employee agreed that IBM would suffer irreparable harm if he failed to comply with non-competition agreement); *Int'l Creative Mgmt., Inc. v. Abate*, No. 07 CIV. 1979 PKL, 2007 WL 950092, at *6 (S.D.N.Y. Mar. 28, 2007) (finding that plaintiff "cannot rely on the contract provision alone to demonstrate irreparable harm"). In *Visentin*, the court considered an *identical* IBM agreement and concluded that IBM cannot "by including certain language in that contract, create a right to injunctive relief where it would otherwise be inappropriate." 2011 WL 672025, at *7 n.4 ("The significance of this provision is also diminished by the fact that there was no meaningful negotiation regarding any of the terms of the noncompetition agreement.").[1]

---

[1] The very cases on which IBM relies for the proposition that certain provisions of the Noncompetition Agreement reveal McIntyre's "admission" of irreparable harm make clear that the existence of such provisions is merely one factor in the irreparable harm analysis. *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (considering such provision as one factor in affirming post-trial *permanent* injunction, and in no way suggested that provision entitles moving party to presumption of irreparable harm); *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (noting that contractual provision was one factor in the irreparable harm analysis).



Page 3

Accordingly, this Court must "rigorously examine" McIntyre's          Non-competition Agreement by "strictly appl[ying]" the reasonableness standard before enforcing the agreement, regardless of any "admission" of irreparable harm contained in the agreement.

## II.  Microsoft's Prior Statements in the *Moussouris* Litigation are Irrelevant

As part of its effort to establish that IBM's diversity-related information is a protectable trade secret, IBM refers to Microsoft Corporation's ("Microsoft") prior statements that were made in an entirely different context in an unrelated class action litigation[2] and that relate to certain Microsoft information.  In that other litigation, Microsoft argued that certain documents reflecting its diversity initiatives, strategy, and representation data should be sealed from *public* disclosure for, among other reasons, competitive considerations.  *See Moussouris v. Microsoft Corp.*, No. 2:15-cv-01483-JLR (W.D. Wash.), Dkts. 88, 152, 177, 178, 269, 272, 280, 283, 296.

IBM's argument that Microsoft's prior statements are relevant to the instant motion for a preliminary injunction to enforce a non-competition agreement is completely misguided.  First, the statements were made in an entirely different context, attempting to shield specific documents from public disclosure in the course of a class action litigation.  IBM misses a critical point in its extensive discussion of *Moussouris* in its brief—the motions to seal related to the public disclosure of certain documents, meaning that Microsoft was seeking to prevent the public (who is not subject to any non-disclosure obligations) from accessing Microsoft's highly sensitive information.  In stark contrast, McIntyre is subject to non-disclosure and confidentiality obligations, which she has affirmed she will honor.  (McIntyre Decl. ¶¶ 15, 21, 34.)  Second, Microsoft in the *Moussouris* litigation did not argue that all diversity-related information about Microsoft's diversity programs and data should be protected from public disclosure (as much of that information is in the public domain), only the sensitive documents referenced in the motions to seal.  Third, as discussed further below, neither McIntyre nor Microsoft would have any competitive use for any IBM information that McIntyre may have in her memory.  Fourth, Microsoft's arguments for withholding certain statistical analyses from discovery in the *Moussouris* matter are immaterial, as Microsoft invoked the *attorney-client privilege* to withhold certain statistical analyses related

---

[2] The Special Master in the *Moussouris* litigation recently filed a report and recommendation regarding Microsoft's latest motions to seal.  *See* Report and Recommendation on Motions to Seal, *Moussouris v. Microsoft Corp.*, No. 2:15-cv-01483-JLR (W.D. Wash.), Dkt. 351.  The Special Master held that Microsoft's diversity initiatives and strategies at-issue should be filed under seal, but that Microsoft's "actual raw diversity data" should not be redacted because it only causes business harm, not competitive harm.  *Id.* at 24-25.



Page 4

to Microsoft's compensation, performance review, and promotion practices conducted by outside counsel.  Importantly, Microsoft produced all of the underlying data during discovery in that case. In sum, Microsoft's positions in the *Moussouris* case are entirely irrelevant here.

### III.    Neither McIntyre nor Microsoft Has Any Need for IBM's Purported Trade Secrets

Even if this Court finds that the IBM diversity-related data and information at-issue are trade secrets, there is simply no basis to conclude that McIntyre's purported knowledge of IBM's diversity practices would be of any use to her work at Microsoft.

First, Microsoft is currently an industry leader on diversity and inclusion.  Over the years, Microsoft has spent tens of millions of dollars to develop and implement its highly-acclaimed diversity and inclusion initiatives.[3]  As a result of allocating such significant resources, Microsoft does not need or want other companies' confidential information or ideas.  In other words, McIntyre is not seeking to join a startup technology company where she would be building its diversity and inclusion programs from the ground floor.  Instead, McIntyre's role at Microsoft will be to implement its existing programs.  Microsoft's motions to seal in the *Moussouris* case simply underscore the fact that Microsoft's diversity-related initiatives and strategies are fully developed and successful, and its most sensitive documents require protection from public disclosure. Accordingly, Microsoft has no competitive need for IBM's diversity-related strategies.

Second, Ms. McIntyre's work depends entirely on the culture of her organization.  As she explained in her declaration, McIntyre's work as Microsoft's Chief Diversity Officer will be centered on Microsoft's corporate culture and its internal goals as an organization.  (McIntyre Decl. ¶ 12.)  These are entirely distinct from IBM's culture and goals.[4]  In other words, whatever

---

[3] In fact, Microsoft has ranked higher than IBM in a number of diversity and cultural metrics.  *See, e.g.*, *10 of the Biggest Companies in Tech: A Culture Comparison*, Comparably (Aug. 23, 2017), https://www.comparably.com/blog/10-pubic-companies/ (based on employee ratings Microsoft ranks higher than IBM on all scores – i.e., "overall culture score," "CEO score," "Gender Score," "Diversity Score").

[4] *See* Malia Boyd, Corporate Cult – Or Corporate Culture?, Incentive (1994) ("Across the country and across the culture spectrum from Big Blue lies Microsoft Corp."); David Hewson, Virtual Vacancies, The Sunday Times (London) (1997) ("Some prefer the smart-suited smooth approach, such as IBM.  Others, such as Apple, have a laid-back West Coast culture.  Microsoft sits somewhere in between – casual, but highly focused and intensely competitive."); Samar Birwadker, What It's Like To Work At Microsoft vs. IBM (Data), Linkedin (April 8, 2015), https://www.linkedin.com/pulse/what-its-like-work-microsoft-vs-ibm-data-samar-birwadker/ (exploring the



Page 5

IBM's strategy for improving diversity and inclusion at IBM has been or may be, it has no application to Microsoft's current and future strategies to advancing diversity and inclusion given differences in leadership, human capital philosophy, corporate history and structure, and location.

Third, Plaintiff neglects to mention that McIntyre and Microsoft have committed to follow a set of protocols to assure IBM that she will in no way competitively disadvantage IBM.  For the one year following her separation from IBM, McIntyre will not have responsibility with respect to three important functions of her role at IBM—executive succession planning, OFCCP compliance and reporting, and recruiting for positions that would conflict with her non-solicitation obligations. Even with these restrictions and McIntyre's continued compliance with her non-disclosure obligations, IBM unreasonably seeks to enjoin McIntyre from continuing her career in her chosen field for a company whose location will allow her and her family to reside close to her extended family.

We thank the Court for its attention to this matter and will be prepared to answer any questions the Court may have at tomorrow's conference.

Respectfully submitted,

*/s/ Michael Delikat*

Michael Delikat

---

difference between the company culture at Microsoft and IBM noting that trying to compare the two is "like comparing warriors and wizards").